MAGISTRATE JUDGE SNOW

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**

CIV-COHN

LADY OF AMERICA FRANCHISE CORPORATION, a Florida corporation,

Plaintiff,

vs.

Case No. 06-60567

GEORGE MURPHY,

**COMPLAINT**

Defendant.
_______________________________/

Plaintiff, LADY OF AMERICA FRANCHISE CORPORATION ("LOAFC"), by and through undersigned counsel, hereby sues Defendant, GEORGE MURPHY (hereinafter referred to as "Mr. Murphy"), and states as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, LADY OF AMERICA FRANCHISE CORPORATION ("LOAFC"), is a Florida corporation having its principal place of business in Broward County, Florida.

2. Defendant, GEORGE MURPHY ("Ms. Murphy"), is an individual of the age of majority and is a citizen and resident of the State of Nevada.

3. This Court has personal jurisdiction over the Defendant by virtue of the following:

(i) LOAFC and the Defendant have carried on a continuous course of direct communications by mail and by telephone through LOAFC's headquarters located in Broward County, Florida;

(ii) the course of dealing between LOAFC and its franchisees, including Defendant, reflects that decision-making authority is vested at LOAFC's headquarters in Broward County, Florida;



ZARCO EINHORN SALKOWSKI & BRITO, P.A.
BANK OF AMERICA TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

(iii) Defendant negotiated with LOAFC and entered into the subject Franchise Agreement with LOAFC in Broward County, Florida with the knowledge that she would benefit from her affiliation with LOAFC;

(iv) Defendant voluntarily entered into the Franchise Agreement and related agreements with LOAFC which envisioned continuing and wide-reaching contacts with LOAFC in Broward County, Florida, including the regulation of her franchised business from LOAFC's headquarters in Broward County, Florida;

(v) Defendant has purposefully availed herself of the benefits and protections of Florida law by entering into the subject Franchise Agreement with LOAFC, which expressly states that Florida law will govern any disputes relating to the Franchise Agreement; and

(vi) Defendant agreed to personal jurisdiction in Broward County, Florida and also waived all objections to personal jurisdiction under Section 11.4 of the Franchise Agreement.

4. This Court has jurisdiction pursuant to 28 U.S.C. §1332. The parties are citizens of different states and the matter in controversy exceeds the sum of Seventy Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

5. Venue is appropriate pursuant to 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims alleged in this pleading arose and/or occurred in this judicial district. In addition, venue is proper in this Court pursuant to Section 11.3 of the Franchise Agreement between the parties.

## GENERAL ALLEGATIONS

### Nature Of The Parties' Relationship

6. Plaintiff, LADY OF AMERICA FRANCHISE CORPORATION, is the franchisor of aerobic and health services in neighborhood-based centers to various individuals and businesses using the "Lady of America" and "Ladies Workout Express" trade name and marks.

7. LOAFC has been the franchisor of Lady of America fitness clubs since 1989 and the franchisor of Ladies Workout Express since 1992. LOAFC sells Lady of America and Ladies Workout Express franchises to third-parties throughout the United States.

8. On or about October 15, 1999, Mr. Murphy entered into a Franchise Agreement ("Agreement") with LOAFC for the operation of a Lady of America fitness club located at 7220 W. Lake Meade Boulevard, Las Vegas, Nevada 89128.[1]

9. The Agreement was for a period of ten (10) years, or until October 14, 2009. The Agreement did not provide Mr. Murphy with the unilateral right to terminate the Agreement prior to its expiration on its tenth (10) anniversary.

10. Section 6.3 of the Agreement provides, in pertinent part, as follows:

> In consideration for the licenses granted in this Agreement and the Franchisor's administrative and lost opportunity costs, and its costs and risks in developing the system, the Franchisee will pay a continuing weekly Registration Percentage Royalty to the Franchisor then due each Monday. The Franchisee's Registration Percentage Royalty will be the greater of 10% of his or her prior week's gross receipts or $100 per week. Upon the Franchisee receiving $250,000 in registration fees, if a Small Unit Center or Personal Training Center, or $500,000 if a Large Unit Center, the Franchisee's Registration Percentage Royalty will be reduced to the greater of 5% of his or her previous week's membership registration fees or $100 per week if the Center is a Small Unit Center or $200 per week if the Center is a Large Unit Center. . . . Royalties on member monthly dues continue at the rate of 10% throughout the term of the franchise.

*See* Agreement, ¶6.3.

11. Section 6.5 of the Agreement provides, in pertinent part, as follows:

> . . . . The Franchisee may be additionally required to pay the Franchisor an "Advertising Contribution" for Advertising Costs of up 3% of its/his or her Gross

---

[1] A copy of the Agreement is annexed hereto as Exhibit "A."

> Receipts in the same manner as the Franchisee pays Royalty, but by separate check. The Franchisee's "Advertising Contribution" will be initiated upon the Franchisor creating an advertising fund, corporation or group (each an "Association") to pool the advertising monies and efforts of the Franchisor and/or the Franchisees . . . .

*See* Agreement, ¶6.5.

12. Section 9.6 of the Agreement provides, in pertinent part, as follows:

> The Franchisee is in default and all rights granted in this Agreement to the Franchisee automatically terminate without notice to the Franchisee becomes "Insolvent," defined as: voluntarily suspending normal business operations . . .

*See* Agreement, ¶9.6.

13. Section 9.9 of the Agreement provides, in pertinent part, as follows:

> On termination, all rights granted to the Franchisee under this Agreement immediately terminate . . . The Franchisee will immediately pay the Franchisor all monies then due and fully prepay any notes or other agreements to pay monies over time to the Franchisor including future Royalties and Advertising Contributions, or to entities which have a controlling interest in the Franchisor or in which the Franchisor has a controlling interest, or to which the Franchisor has guaranteed payment by the Franchisee, irrespective of other terms concerning time of payment.

*See* Agreement, ¶9.9.

14. On or about April 10, 2006, Mr. Murphy closed the doors to his Lady of America Fitness Center without the written consent of LOAFC. Such closure was in violation of Section 9.6 of the Agreement.

15. By closing the doors to the franchised business prior to the expiration of the Agreement, Mr. Murphy defaulted under the Agreement and all rights under the Agreement automatically terminated effective April 10, 2006 as a result of the premature termination of the Agreement.

16. On or about April 13, 2006, LOAFC, through its General Counsel, forwarded a letter

to Mr. Murphy advising him that he was in default of his Agreement by voluntarily suspending normal business operations and that LOAFC deemed the Agreement terminated effective immediately.[2] LOAFC further advised Mr. Murphy that the post-termination obligations contained in the Agreement would remain in effect, including but not limited to, his obligation to pay future royalties and advertising fees.

17. To date, Mr. Murphy has failed to remit his future royalty fee payments and advertising contributions owed to LOAFC for the remaining term of the Agreement in violation of the express language contained in Section 9.9 of the Agreement.

18. All conditions precedent to the commencement of this action have occurred, or have been performed, excused, satisfied or waived.

19. As a result of Mr. Murphy's wrongful conduct, described herein, and LOAFC's need to protect and enforce its legal rights, LOAFC has retained the undersigned attorneys and is obligated to pay said firm reasonable attorneys' fees. LOAFC seeks to recover its reasonable attorneys' fees and costs from Defendant.

## LEGAL CAUSES OF ACTION

### Count I - Breach of Contract

20. LOAFC incorporates each and every allegation set forth in Paragraphs 1 through 19, *supra*, as if fully set forth herein.

21. Mr. Murphy has materially breached the terms of the Agreement. Such breaches include, but are not limited to, the following:

---

[2] A copy of the April 13, 2006 letter is annexed hereto as Exhibit "B."

(i) suspending normal business operations prior to the expiration of the Agreement in violation of Section 9.6; and

(iii) failing to pay all monies, including but not limited to, all future Royalty and Advertising Contributions, for the remaining term of the Agreement in violation of Section 9.9.

22. As a direct, proximate and foreseeable result of Mr. Murphy's material breaches of the Agreement, LOAFC has suffered substantial damages.

**WHEREFORE**, Plaintiff, LADY OF AMERICA FRANCHISE CORPORATION, respectfully requests that this Honorable Court enter a judgment in its favor and against Defendant, GEORGE MURPHY, for: (i) actual and compensatory damages in an amount to be determined at trial, including reasonable attorneys' fees, costs and interest; (ii) lost future royalty fee payments and advertising contributions for the remaining term of the Franchise Agreement; and (iii) such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted,

ZARCO EINHORN SALKOWSKI & BRITO, P.A.
*Counsel for Plaintiff*
Bank of America Tower
100 Southeast 2nd Street, Suite 2700
Miami, Florida 33131
Telephone: (305) 374-5418
Telecopier: (305) 374-5428

By: Himanshu M. Patel
ROBERT ZARCO
Florida Bar No. 502138
ROBERT M. EINHORN
Florida Bar No. 858188
HIMANSHU M. PATEL
Florida Bar No. 0167223

Dated: April 21, 2006.

H:\WP51\KJK\DOCS\4781-loa.wpd
080498
414.5

ATTACHMENT B TO FRANCHISE OFFERING CIRCULAR

Lady of America

# LADY OF AMERICA FRANCHISE AGREEMENT

between

LADY OF AMERICA FRANCHISE CORPORATION,
a Florida corporation

(Franchisor)

and

______________________

(Franchisee)

Dated:_____________, 1999

Location: ____________________
____________________
____________________

EXHIBIT
tabbies
A

# LADY OF AMERICA FRANCHISE AGREEMENT

## TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| ARTICLE 1 - LICENSE | | 1 |
| ARTICLE 2 - DEFINITIONS | | 2 |
| ARTICLE 3 - FRANCHISEE'S AREA AND CENTER | | |
| Section 3.1 | Franchisee's Area | 3 |
| Section 3.2 | Franchisee's Site | 3 |
| Section 3.3 | Center Restriction | 4 |
| Section 3.4 | Additional Locations | 4 |
| ARTICLE 4 - OBLIGATIONS OF THE FRANCHISOR | | |
| Section 4.1 | Pre-Operational Obligations | 4 |
| Section 4.2 | Post-Operational Obligations | 6 |
| ARTICLE 5 - OBLIGATIONS OF THE FRANCHISEE | | |
| Section 5.1 | Site Lease | 8 |
| Section 5.2 | Center Plans | 8 |
| Section 5.3 | Center Construction | 8 |
| Section 5.4 | Training. | 9 |
| Section 5.5 | Management | 9 |
| Section 5.6 | Best Efforts | 9 |
| Section 5.7 | Trademarks | 10 |
| Section 5.8 | Guarantee | 10 |
| Section 5.9 | Finances | 11 |
| Section 5.10 | Franchise Sales | 11 |
| Section 5.11 | Reciprocity | 11 |
| ARTICLE 6 - PAYMENTS TO BE MADE BY THE FRANCHISEE | | |
| Section 6.1 | Franchisee Fee | 12 |
| Section 6.2 | Training and Assistance | 12 |
| Section 6.3 | Royalty | 12 |
| Section 6.4 | Franchisor's Goods and Services | 13 |
| Section 6.5 | Advertising | 13 |

**TABLE OF CONTENTS** (cont)


PAGE

Section 6.6 Advertising Associations . . . . . 14
Section 6.7 Membership Agreement . . . . . 14
Section 6.8 Gross Receipts . . . . . 14
Section 6.9 Money Management . . . . . 15
Section 6.10 Transfer Fee . . . . . 15
Section 6.11 Payment Terms . . . . . 15

ARTICLE 7 - RESTRICTIONS

Section 7.1 Business . . . . . 16
Section 7.2 Standards . . . . . 16
Section 7.3 Supplies . . . . . 17
Section 7.4 Records . . . . . 18
Section 7.5 Ethical Conduct . . . . . 19
Section 7.6 Remodeling . . . . . 19
Section 7.7 Variances . . . . . 19

ARTICLE 8 - RELATIONSHIP

Section 8.1 Independent Businessperson . . . . . 19
Section 8.2 Franchisee Corporation . . . . . 20
Section 8.3 Proprietary Information . . . . . 21
Section 8.4 Restrictions . . . . . 22

ARTICLE 9 - TERM, TRANSFER AND TERMINATION

Section 9.1 Term and Renewal . . . . . 23
Section 9.2 Transfer . . . . . 23
Section 9.3 Death or Incapacity . . . . . 24
Section 9.4 Offerings by the Franchisee . . . . . 24
Section 9.5 Substitute Performance . . . . . 24
Section 9.6 Insolvency . . . . . 25
Section 9.7 Breach . . . . . 25
Section 9.8 Acquisition . . . . . 26
Section 9.9 Termination . . . . . 27

**TABLE OF CONTENTS** (cont)


| | | PAGE |
|---|---|---|
| **ARTICLE 10 - OTHER TERMS** | | |
| Section 10.1 | Insurance | 28 |
| Section 10.2 | Survivability | 29 |
| Section 10.3 | Sales | 29 |
| Section 10.4 | Claims and Indemnity | 29 |
| Section 10.5 | Limitations | 30 |
| Section 10.6 | Orders | 31 |
| Section 10.7 | Impossibility | 32 |
| Section 10.8 | Accord and Satisfaction | 32 |
| Section 10.9 | Representations | 32 |
| Section 10.10 | Security and Guaranty | 33 |
| Section 10.11 | Notices | 33 |
| **ARTICLE 11 - INTERPRETATION** | | |
| Section 11.1 | Entire Agreement | 34 |
| Section 11.2 | Waivers | 34 |
| Section 11.3 | Materiality | 34 |
| Section 11.4 | Governing Law | 35 |
| Section 11.5 | Savings Clause | 35 |
| Section 11.6 | Third Parties | 35 |
| Section 11.7 | Construction | 36 |
| Section 11.8 | WAIVER OF JURY TRIAL | 36 |
| **ARTICLE 12 - ACKNOWLEDGMENT** | | |
| Section 12.1 | Documents Received | 36 |
| Section 12.2 | Representations | 36 |
| EXHIBIT A - SITE AGREEMENT | | 39 |

# LADY OF AMERICA FRANCHISE AGREEMENT

**THIS LADY OF AMERICA FRANCHISE AGREEMENT** is signed on _______________, 1999, between Lady of America Franchise Corporation, a Florida corporation (the "Franchisor") and ______________________________ (the "Franchisee").

## BACKGROUND

A. The Franchisor has developed a System of providing aerobic and health services in neighborhood-based centers and has created public goodwill, proprietary information and materials for use with the System.

B. The Franchisee has visited System Centers, carefully studied and fully understands the Franchisor's System, the disclosures made in the Franchisor's Franchise Offering Circular and the terms and conditions in this Agreement and wishes to become a Franchisee of the Franchisor.

C. The Franchisee understands that this Agreement is for a (check applicable box):

☐ Small Unit Center

☐ Large Unit Center

☐ Personal Training Center

The parties agree as follows:

## ARTICLE 1

## LICENSE

The Franchisor grants a limited license to the Franchisee to use the System at one Center in his or her Franchisee's Area and to represent himself or herself to the public as an authorized System Franchisee at the Center, all on the terms stated in this Agreement. The Franchisee accepts the license granted by the Franchisor and will open and operate a System Center on the terms stated in this Agreement.

## ARTICLE 2

## DEFINITIONS

Capitalized terms in the Franchise Agreement have the meaning given in this Agreement and no other meaning. Some are defined below. Others are defined elsewhere where they appear within quotation marks.

"**Center**" means the Franchisee's licensed premises at the Site for using the System. Typical Centers are designed to accommodate aerobics, exercise machines, tanning facilities, showers, toilets, lockers, training facilities, a child care room, reception area and offices.

"**Operations Manual ("Manual")** means a compilation of documents from the Franchisor, whether delivered singly or as a collection, setting requirements, standards, rules and procedures for establishing, equipping, staffing, operating, marketing, supplying and other aspects of the System. The Manual is further defined in this Agreement.

"**Products**" means the System's equipment, supplies, goods, uniforms, signs, forms, documents and related items specified in the Manual together with all modifications and other tangibles and intangibles that the Franchisor adds to the system by amending the Manual.

"**Proprietary Information**" means information the Franchisor discloses to the Franchisee or the Franchisee obtains due to his or her use of the System or his or her relationship with the Franchisor or other System franchisees including the System's Manual, training manual, forms, documents, product and market research, existing or potential products, suppliers, customers, franchisees, technology, methods, operations, show-how, know-how, confidential business information, updates and changes to any of the same.

"**Lease**" means the Franchisee's agreement permitting he or she to occupy the Center, whether a purchase agreement or lease from a landlord.

"**Marks**" means the System's trademarks, service marks, trade names, trade dress, logos, indicia, personalities, publicly displayed copyrighted works and any items symbolizing its public goodwill include LADY OF AMERICA, LADY OF AMERICA & Design, HEALTH CLUBS OF AMERICA, HEALTH CLUBS OF AMERICA & Design, TRAINING CENTERS OF AMERICA, TEXAS LADY SPA, TEXAS LADY SPA & Design, TEXAS LADY-TEXAN and TEXAS LADY-TEXAN & Design. Without limiting the foregoing, the Marks are defined further in this Agreement.

"**Site**" means the specific address of the Center.

"Site Agreement" means the agreement attached as Exhibit A to this Agreement, to be completed and signed when a Site is selected and agreed on.

"System" means the Franchisor's standard business concepts and methods and the standard benefits and limitations which are licensed to the Franchisor's franchisees generally, all in association with the Marks, namely, the limited rights to use Franchisor's Marks, Products, Proprietary Information, Operations Manual, forms, documents, checklists and standard advertising slicks; advertising, supplying, operating, marketing, sales and recording methods and materials, all solely as expressly granted to the Franchisee in this Agreement; and all other benefits and assistance that the Franchisor agrees in writing to provide the Franchisee, all subject to the terms of the Franchise Agreement and the Manual.

## ARTICLE 3

## FRANCHISEE'S AREA AND CENTER

**Section 3.1 Franchisee's Area.**

"Franchisee's Area" is the geographic area having a diameter of 3 miles and a center point located at the Franchisee's Center. The Franchisor will not locate or authorize any other party to locate a System Center within the Franchisee's Area as long as the Franchisee is in compliance with this Agreement and will state the rules in the Manual for dealing with membership sales by a System Center to persons who reside within another System Center's Franchisee's area concerning allocation of membership fees, referral fees, etc., and dealing with member transfers between System Centers, transfer fees, etc. The Franchisor does not grant the Franchisee an exclusive marketing area. Customers in the Franchisee's Area may choose to purchase from System Centers located outside of the Franchisee's Area. The Franchisor has the right to adopt and implement procedures prohibiting, limiting or regulating the Franchisee's business conduct, solicitation and marketing in other System Center's areas.

**Section 3.2 Franchisee's Site.**

The Franchisee is entitled and obligated to construct or remodel and to equip, staff, open and operate at his or her own expense one Center at the agreed Site and at no other place. The Franchise is responsible for locating his or her own Site within his or her Site Selection Territory identified below and entering an approved purchase agreement or Lease within 6 months. The Franchisee will submit each requested Site to the Franchisor with a completed Site Agreement as attached to this Agreement as Exhibit A and a completed System standard site evaluation form. The Franchisee must obtain the written approval of the Franchisor's President, not to be unreasonably withheld, for the proposed Site and proposed Lease. The Franchisee is cautioned against entering into agreements that are not expressly contingent on the Franchisor's approval. If the Franchisee does not properly submit any Site/Lease package meeting the Franchisor's

standard criteria within 12 months, the Franchisor may terminate this Agreement and retain the Franchisee Fee.

Section 3.3 Center Restriction.

The Franchisee will select the type of Center he or she desires in ARTICLE ___, that is, a small unit Center, large unit Center or personal training Center. Centers restricted to one sex will not permit persons of the other sex to use the Center except under the rules stated in the Manual or with the Franchisor's written consent. The System Marks that the Franchisee will use to identify his or her Center is indicated in ARTICLE ___.

Section 3.4 Additional Locations.

If the Franchisee loses his or her right to maintain possession of the Center due to expiration of the Lease before expiration of the Franchise Agreement, the parties will return to the selected portion of Section 3.2 for location of new Lease within the Franchisee's Area. No refunds will be due from the Franchisor if a new Lease does not materialize. The Franchisee may open additional System Centers if the Franchisee and the Franchisor's President later agree in writing. The Franchisee will enter into a separate Franchise Agreement for each additional center on terms then being offered by the Franchisor in that state, which may be substantially different than the Franchise Agreement, and pay additional franchisee fees for each Center as required in this Agreement.

## ARTICLE 4

## OBLIGATIONS OF THE FRANCHISOR

Section 4.1 Pre-Operational Obligations.

The Franchisor will provide the following assistance to the Franchisee before the Center opens for business:

(a) System License. The Franchisor will permit the Franchisee to use the System at his or her Center and to represent himself or herself as an authorized Franchisee of the Franchisor in operating the Center as stated in this Agreement.

(b) Site Selection. If the Franchisee has not obtained an approved Site together with the Franchise Agreement, the Franchisor will assist the Franchisee in his or her Site selection by loaning the Franchisee the Franchisor's Site selection criteria documentation and comparing the proposed Site with the Franchisor's criteria. The Franchisor's assistance is conditioned on the Franchisee timely providing the Franchisor full information concerning the proposed Site on the Franchisor's forms. The Franchisor's suggestion or approval of a Site does not guarantee its

success or that it will meet the Franchisee's needs. Final Site selection is made by the Franchisee who consults with and relies on his or her own qualified advisors concerning the Site.

(c) **Lease Negotiations**. If the Franchisee is to lease the Site from a third party, the Franchisor will assist the Franchisee in his or her lease negotiations by loaning the Franchisee the System's Franchisee Lease Negotiation Checklist.

(d) **Center Plans**. The Franchisor will loan the Franchisee a sample set of the Franchisor's standard center plans and specifications and/or standard specifications of the Franchisor's requirements for design, layout and decorations. These may have to be adapted to the Site and may not otherwise be entirely appropriate for the Franchisee's Center. The Franchisee will modify and adapt the standard plans and specifications to the Site and local conditions and obtain the Franchisor's approval thereof, approval not be unreasonably withheld. The Franchisee acknowledges that the Franchisor's standard center plans define or reflect protectable trade dress which belongs exclusively to the Franchisor and that the overall appearance, design, layout, and decoration of the Franchisee's Center represents trade dress belonging exclusively to the Franchisor, even if adapted or changed from that prescribed by the Franchisor's standard center plans.

(e) **Signs**. The Franchisor will loan the Franchisee specifications of the Franchisor's requirements for outdoor and indoor signs to project the System's image to the public and identify a source capable of providing signs to the Franchisee. The Franchisor will loan the Franchisee a list specifying equipment and fixtures available to System franchisees generally from the Franchisor, if any.

(f) **Equipment and Fixtures**. The Franchisor will loan the Franchisee specifications of the Franchisor's requirements for exercise equipment and fixtures for use with the System and identify a source capable of providing equipment and fixtures meeting the specifications to the Franchisee. The Franchisor will loan the Franchisee a list specifying equipment and fixtures available to system Franchisees generally from the Franchisor, if any. The Franchisor will offer the Franchisee the equipment and fixtures as it makes available to other System franchisees generally, subject to availability, scheduling and agreement on payment and provided the Franchisee is not in any default with the Franchisor. The Franchisor may lease and not sell some items.

(g) **System Products**. The Franchisor will loan the Franchisee a list of Products approved for use with the system and identify a source capable of providing Products to the Franchisee. The Franchisor will loan the Franchisee a list specifying Products available to System franchisees generally from the Franchisor, if any. The Franchisor will offer the Franchisee the Products as it makes available to other system franchisees generally subject to availability, scheduling, agreement on payment and provided the Franchisee is not in any default with the Franchisor.

(h) **Training Manual**. The Franchisor will loan the Franchisee one copy of the System's Training Manual for use during initial training and operation of the Center. The Training Manual may be an integral part of the Operations Manual.

(i) **Initial Training**. The Franchisor will provide the franchisee an initial basic training program in English concerning opening a standard System Center and managing, marketing and operating the System as a Standard System Center. The Franchisor will make other training available as the Franchisor deems appropriate subject to the terms stated elsewhere in this Agreement. The initial training program will be at locations selected by the Franchisor and include both classroom training and on-the-job training.

(j) **Money Management**. The Franchisor will provide the Franchisee the Franchisor's Money Management Agreement on the Franchisor's then current standard terms to provide a centralized means of electronically billing the Franchisee's members' bank accounts and qualifying credit card accounts for monthly membership dues owed by the members.

(k) **Operations Manual**. The Franchisor will loan the Franchisee one copy of the System's Operations Manual for opening a Standard System Center and managing, marketing and operating the system as a Standard System Center for the duration of the Franchise Agreement and update the same as the Franchisor deems useful.

(l) **Pre-Opening Assistance**. The Franchisor will provide pre-opening assistance to the Franchisee by providing an advisor at the Center for 2 days, sequential or not, before or during the Center's opening to offer general advice for opening, managing, marketing and operating a Standard System Center in accordance with the System's standards. The advisor's responsibility and authority is strictly limited to giving general advice concerning the System's standards. The Franchisee has exclusive authority to instruct his or her employees and sole responsibility for his or her Center and his or her operations.

**Section 4.2** **Post-Operational Obligations**.

The Franchisor will provide the following assistance to the Franchisee after the Center opens for business:

(a) **System License**. The Franchisor will permit the Franchisee to use the System at his or her Center and to represent himself or herself as an authorized Franchisee of the Franchisor in operating the Center as stated in this Agreement.

(b) **On-Site Assistance**. The Franchisor will provide on-site assistance to the Franchisee by providing an advisor at the Center for 2 days, sequential or not, during or shortly after the Center opens to offer general advice for opening, managing, marketing and operating a standard center in accordance with the System's standards. The advisor's responsibility and authority is strictly limited to giving general advice concerning the System's standards. The

Franchisee has exclusive authority to instruct his or her employees and sole responsibility for his or her Center and his or her operations.

(c) Training and Updates. The Franchisor will make additional instruction and training available to the Franchisee at central locations as time reasonably permits and provide the Franchisee updates to the Operations Manual that the Franchisor makes available to System franchisees generally as the Franchisor prepares these updates.

(d) Standards. The Franchisor will make reasonable efforts to maintain the System's standards of quality and service by conducting inspections of System Centers as it deems useful, revising the system as it deems advisable and notifying the Franchisee of Operations Manual updates and changes in the System. The Franchisor will receive and review the Franchisee's suggestions for improvement of the System.

(e) System Benefits. The Franchisor will make available methods of standardizing operations throughout the System, loan the Franchisee an Operations Manual, deliver amendments of same to the Franchisee and identify qualified sources of equipment and supplies to operate the System at the Center.

(f) Additional Assistance. The Franchisor will be reasonably available to give the Franchisee additional advisory assistance as stated in the Manual on a reasonable request basis or when deemed necessary by the Franchisor. Assistance may be in person, telephonic or by publication as the Franchisor deems appropriate. If requested by the Franchisee, and if personnel are available, a Franchisor's representative may provide additional training or assistance to the Franchisee at the Franchisor's then current standard fees and expenses.

(g) Marketing Assistance. The Franchisor will make the System's stock advertising copy available to the Franchisee and review proposed advertising sent by the Franchisee to the Franchisor. The Franchisor will inform the Franchisee of the marketing concepts the Franchisor makes available to System franchisees generally.

(h) Advertising Associations. The Franchisor may implement national, regional or local advertising associations as the Franchisor deems useful to combine the advertising efforts of System franchisees, such as common advertisements, common advertising agencies and coordination of ad placement, any specific efforts being in the Franchisor's discretion. Establishment of any advertising association depends on the existence of other system Centers in the Franchisee's Area of Dominant Influence ("ADI"). The Franchisor does not represent or promise that any cooperative advertising associations or efforts will occur or be useful as the same are dependent on the cooperation of others.

(i) Reciprocity Management. The Franchisor will oversee distribution of the Franchisee's Center membership information to other system Centers to permit the Franchisee's Center members to use the facilities of other System Centers.

ARTICLE 5

OBLIGATIONS OF THE FRANCHISEE

**Section 5.1 Site Lease.**

The Franchisee will obtain an approved Site and an approved Lease. The Franchisee will use his or her best efforts to include the provisions discussed in the System's Franchisee Lease Negotiation Checklist in the Lease.

**Section 5.2 Center Plans.**

The Franchisee will employ a qualified architect to adapt the System's plans and specifications to the Site and all applicable laws, regulations, ordinances, lease requirements and market conditions, being especially mindful of all zoning, signage, parking, access, health, environmental and storage requirements. The Franchisee will submit his or her plan for adapting the System to the Site to the Franchisor for written approval, not change the same without the Franchisor's written approval, submit the information required by the Franchisor concerning the Franchisee's general contractor and certify to the Franchisor that the Franchisee has obtained all permits and permissions required for lawful construction and operation. The Franchisee is solely responsible for selecting, supervising and paying for architects, contractors, detailed plans, equipment, supplies, financing, fixtures, signs, working capital, and all other aspects of creating and opening the Center. The Franchisee will return to the Franchisor all of the Franchisor's standard plans and specifications on or before the Center opens.

**Section 5.3 Center Construction.**

The Franchisee will begin construction, by setting footings for new construction or by beginning demolition for remodeling, within the earlier of 60 days after Site approval or 30 days after the Lease is entered into and promptly provide written notice to the Franchisor thereof. The Franchisee will construct (or remodel) the Premises in strict accordance with the approved plans and specifications, maintain continuous construction and complete construction, including all carpentry, electrical, painting and finishing work and installation of all fixtures, equipment and signs within 3 months of entering the Lease, exclusive of time lost due to strike, fire or other casualty or act of God. The Center's construction, appearance, design, fixtures and equipment, both outside and inside, and/or any remodeling, repair or alteration thereof, must strictly comply with the Franchisor's standards. The Franchisor and its agents may inspect the construction at any time. The Franchisee will obtain a certificate of occupancy within 10 days after completion of construction, seek the Franchisor's approval of the Center for opening and open the Center within 10 days after obtaining the Franchisor's approval for opening.

**Section 5.4** **Training.**

The Franchisee and the Franchisee's manager will, within 4 months of the Franchise Agreement and before the Center opening, attend and successfully complete to the Franchisor's satisfaction, the Franchisor's initial basic training program. Thereafter, whoever exercises direct on-site management of the Franchisee's Center must have successfully completed the Franchisor's management training program. The Franchisee and the Franchisee's manager and/or the Franchisee's other personnel will attend and complete to the Franchisor's satisfaction any additional training as the Franchisor may require, but not more than once annually, at the locations as the Franchisor designates. The Franchisee's instructors must be certified by successfully completing the Franchisor's training in use of the System prescribed in the Manual. The Franchisee and the Franchisee's manager will be physically on-site at the Center when the Franchisor's personnel are there to assist in the Franchisee's pre-opening, on-site training and grand opening.

**Section 5.5** **Management.**

The Franchisee must personally participate in the actual operation of the Center including spending a minimum of an average of 10 hours a week during all 4-week periods personally at the Center actively managing it. There are 13 successive 4-week periods a year. If the Franchisee is not an individual person or has obtained the Franchisor's written approval to not personally manage the Center, the Franchisee must employ a manager approved by the Franchisor to personally manage the Center on a full-time basis. The Franchisee has sole authority to control the manager's actions and compensation and may remove any manager at any time. The Franchisor may revoke its approval of any manager and/or require the principal owner of the Franchisee to be the manager if the Franchisor deems the same to be in the best interest of the System. The Franchisee must obtain the Franchisor's written approval of any operating entity or arrangement.

**Section 5.6** **Best Efforts.**

The Franchisee will use his or her best efforts to market and to fully develop and maximize the business potential of the System throughout the Franchisee's Area including aggressively advertising and promoting it, obtaining and maintaining all facilities, equipment, Products, trained staff, etc., as described in the Manual; continuously operating the System at the Center at its full capacity for the full term of the Franchise Agreement; devoting the Franchisee's full time and attention to these ends; and complying with all other agreements that relate to the Franchisee's use of the System and Center, including all agreements with System franchisees or System associations, all in strict compliance with the Manual, as it may be revised.

**Section 5.7 Trademarks.**

The Franchisee will use the System's pre-opening and opening advertising promotions and procedures prescribed in the Manual. The Franchisee's advertising, marketing and promotions including type, quantity, placement, timing, choice of agency, etc., must be strictly within the Manual's guidelines and have the Franchisor's written approval. The Franchisor may require all or part of the Franchisee's advertising to be placed through the Franchisor or a Franchisor approved agency. The Franchisee agrees the Marks are valid and enforceable trademarks and the Franchisor has the sole right to use them. The Franchisee has investigated the full trade area for his or her Center and verified that none of the Marks are currently being used by third parties there in ways that conflict with the Franchisee's proposed use of the Marks. The Franchisee will immediately and actively assist the Franchisor in prosecuting or defending the Franchisor's claimed rights in the Marks, permit the Franchisor to control any litigation or proceeding hereon, not take any action in derogation thereof, immediately report to the Franchisor any infringements thereof and cooperate fully and sign any papers useful to accomplish these purposes, all at the Franchisee's sole expense. The Franchisee has no right to make any demands of any third parties due to the third party's use of any of the Marks or to prosecute any claims. The Franchisee will use only the System's Marks with the System and Center and not use any part of the Marks except as specifically permitted in the Manual. Any use of the Marks by the Franchisee outside the scope of the Franchise Agreement is an infringement of the Franchisor's exclusive rights. The Franchisee will not infringe the Marks during or after the term of the Franchise Agreement. The Franchisee will not use any part of the Marks as part of his or her corporate name or trade name or in any other manner nor make any representations about any part of the System except as shown in the System's stock advertising or with the Franchisor's express written consent. The Franchisee's own name must be on all licenses, permits, tax returns, stationery, business cards, invoices, agreements, etc. The Franchisee will always announce that he or she is "independently owned and operated" or some similar statement approved by the Franchisor and prominently display a sign to this effect near the Center's main entrance. Examples: Franchisee name "Joe Smith" or "Smith, Inc.", Trade name "Texas Lady Spa of Austin, Texas;" Letterhead, sign inside Center and agreements "Texas Lady Spa of Austin, Texas, independently owned and operated by Smith, Inc." or "Smith, Inc. d/b/a Texas Lady Spa of Austin, Texas." The Franchisor may use the System to sell other products or services and may establish or license different systems without providing the Franchisee any rights thereto. There must not appear in any advertising or directory listings for the Center any telephone numbers other than the Center's telephone numbers identified by the Franchisee's authorized System Franchisee name. The Franchisee will promptly comply with the Franchisor's directives concerning telephone service, listing and advertising including assigning to the Franchisor, upon its written request, any telephone number owned by the Franchisee or any of its Associated Persons.

**Section 5.8 Guarantee.**

A feature of the System is its guarantee of fitness and weight results to its members subject to their completing 3 exercise classes at the Center each week and following the System's individually designed wellness programs. The Franchisee's instructors will offer the individual program designing and the exercise and wellness programs and will keep the records as the

Manual prescribes. The Franchisees will offer the guarantees to generally involve extending the members contract terms without renewal or registration fees and without any increase in monthly membership dues.

**Section 5.9 Finances.**

The Franchisee's reputation for creditworthiness is a material part of the System. The Franchisee will promptly pay all obligations when due, including those to the Franchisor, other system franchisees, System Associations, employees, landlords, suppliers, taxing authorities and any third parties who have extended credit to the Franchisee. The Franchisee will process all accounts receivable, credit card authorizations and monthly bank drafts through the Franchisor under the Franchisor's standard Money Management Agreement. The franchisee expressly agrees that any dues processing companies employed by the Franchisor to provide money management service are solely agents of the Franchisor, have no duties to the Franchisee and are not responsible for following any instructions from the Franchisee. The Franchisee's sole right to receive funds via the System's money management service is directly from the Franchisor and not from any club member whose dues are collected via the System's money management service or from the dues processing company the Franchisor employs to accomplish all or part of the same.

**Section 5.10 Franchise Sales.**

The Franchisee will fully cooperate with the Franchisor's efforts to sell additional System franchises including displaying information concerning the franchise sales at the Center, making himself or herself available to truthfully answer the questions of prospective franchisees if requested by the Franchisor and assisting in training of new franchisees and their personnel at the Center.

**Section 5.11 Reciprocity.**

All entities, be they individuals, corporations, partnerships, etc., who are members in good standing with any System Center, will have access and privileges to the Franchisee's Center equal to the Franchisee's own Center members. The Franchisor will inform the Franchisee of the other System Centers. The Franchisee will honor a System member entity's request to use its Center unless the Franchisee verifies with the other System Center that the entity is not a member in good standing. Likewise, the Franchisee will promptly and accurately respond to other System Centers' requests concerning the membership status of entities claiming to be members in good standing at the Franchisee's Center. The Franchisee will hold the membership information of other System Centers' in strict confidence. The Franchisee will provide its then current membership list to the Franchisor in accordance with the schedules and forms prescribed in the Manual. The Franchisor's decision in any particular reciprocity matter is binding on all concerned. The Franchisor reserves the right to extend complimentary System membership privileges to any entity, which will be honored by the Franchisee without charge. The Franchisee will join and abide by all rules of the International Physical Fitness Association (IPFA) and the National Health Club Association (NHCA). The IPFA and NHCA are national organizations that extend

membership reciprocity privileges between approximately 1,500 participating health clubs. The Franchisor may implement rules concerning transferring the memberships of the System members who move from one System franchisee's area to another System franchisee's area. These rules may require payment of transfer fees and assignment of membership contracts and payments.

## ARTICLE 6

## PAYMENTS TO BE MADE BY THE FRANCHISEE

**Section 6.1** **Franchisee Fee.**

The total Franchise Fee to be paid by the Franchisee to the Franchisor for this Agreement is $12,500 to $35,000 if the Franchisee's Center is to be a Single Unit Center, $12,500 to $35,000 if the Franchisee's Center is to be a Large Unit Center, or $12,500 if the Franchisee's Center is to be a Personal Training Center. The higher range of franchise fees will be applicable for franchises in states where the Franchisor has established System Centers. The Franchisee will pay an "Initial Franchise Fee" of $2,500 to the Franchisor upon submission of the Deposit Agreement, that will be returned if the Franchisor does not accept the Agreement within 15 days, and pay a "Balance of Franchisee Fee" as is needed to complete the total Franchise Fee to the Franchisor upon signing a lease for the proposed Site for the Franchisee's Center as described in Section 3.2 of this Agreement. The Franchise Fees are nonrefundable and in partial payment for the Franchisor's administrative costs, opportunities lost or deferred, past efforts in developing the System, a license to use the System and the advantages made available to the Franchisee under this Agreement.

**Section 6.2** **Training and Assistance.**

The Franchisor will provide the instructional and training materials used in the initial training program without charge to the Franchisee. The Franchisee is always responsible for all of his or her own costs, including the Franchisee's personnel salaries and "Personal Expenses" (meals, lodging, transportation, etc.), the Franchisor's on-site assistance, additional training and additional assistance will be at the Franchisee's expense, namely, the Franchisor's then current published rates, minimum charges, expenses and Personal Expenses, all subject to change via amendments to the System's Manual. Training will occur at the Franchisor's headquarters or where designated by the Franchisor.

**Section 6.3** **Royalty.**

In consideration for the licenses granted in this Agreement and the Franchisor's administrative and lost opportunity costs, and its costs and risks in developing the system, the Franchisee will pay a continuing weekly Registration Percentage Royalty to the Franchisor due each Monday. The Franchisee's Registration Percentage Royalty will be the greater of 10% of his or her prior week's gross receipts or $100 per week. Upon the Franchisee receiving $250,000 in registration fees, if a Small Unit Center or Personal Training Center, or $500,000 if a Large

Unit Center, the Franchisee's Registration Percentage Royalty will be reduced to the greater of 5% of his or her previous week's membership registration fees or $100 per week if the Center is a Small Unit Center or $200 per week if the Center is a Large Unit Center. Gross Receipts is defined in ARTICLE 6. Royalties on member monthly dues continue at the rate of 10% throughout the term of the franchise.

**Section 6.4** **<u>Franchisor's Goods and Services</u>.**

The Franchisor offers certain goods and services identified in the Manual to the Franchisee. The terms of these transactions will be governed by the Franchise Agreement and the Manual except to the extent that the parties agree otherwise in writing.

**Section 6.5** **<u>Advertising</u>.**

The Franchisee may spend as much money advertising his or her Center as he or she desires subject to the restrictions contained in the Franchise Agreement. The Franchisee will spend at least $1,500 to $2,500 per month, initially, on marketing during the 90 days before the Center opening and thereafter spend at least $1,000 per month on advertising the System in his or her Franchisee's Area as prescribed in the Manual that will include at least a monthly mass mail-out or a ½ page advertisement in the local newspaper having the greatest local circulation and as prescribed more particularly in the Manual. The Franchisor may implement methods of averaging Gross Receipts over time to produce predictable monthly advertising requirements. The Franchisee's expenditures for promotional discounts, that is, coupon reductions and otherwise, will not be counted as advertising. The Franchisor may require the Franchisee to create and place his or her advertising through a Franchisor owned or approved media agency and, in that event, the Franchisor may seek and retain the commission paid by the advertising seller, limited to a 15% advertising agency commission. The Franchisee may be additionally required to pay the Franchisor an "Advertising Contribution" for Advertising Costs of up to 3% of its his or her Gross Receipts in the same manner as the Franchisee pays Royalty, but by separate check. The Franchisee's "Advertising Contribution" will be initiated upon the Franchisor creating an advertising fund, corporation or group (each an "Association") to pool the advertising monies and efforts of the Franchisor and/or the Franchisees. "Advertising Costs" include the cost of: precursor activities such as surveys, design, layout, legal and administration expenses; trademark and trade dress development, clearance, registration, maintenance and protection; creating, developing, preparing and testing advertising and promotional materials, marketing and public relations personnel or agencies; distribution and media placement; taxes; and related expenses. A portion of these amounts may be reimbursements to the Franchisor due to its internal and external expense of providing the same. Selection of advertisements, media and locale for media placement is at the Franchisor's discretion. No advertising program can equally benefit all franchisees. Nothing in this Agreement requires allocation of advertising costs on a pro rata, proportional basis or otherwise. The Franchisee is not entitled to any specific benefit due to his or her Advertising Contributions. The Franchisee's failure to derive any specific benefit from the Advertising Contributions is not cause for the Franchisee reducing or ceasing the same. Monies remaining in any Advertising Costs accounts will be carried forward unless the Franchisor elects to end the account. Advertising Contributions are not investments. No interest will accumulate on unused portions thereof in favor of the Franchisee.

**Section 6.6** **Advertising Associations.**

The Franchisor may create advertising funds, corporations or groups (each an "Association") to pool the advertising monies and efforts of the Franchisor and/or franchisees. The Franchisor will, in its sole discretion, designate the area covered by any Association. Each System Center will be entitled to one vote in each Association it is a member of, provided it complies with that Association's rules. Centers within an Association's area which are owned by the Franchisor will each contribute to and vote in the Association on the same basis as the franchisee centers generally in that Association. Associations may be structured to grant the Franchisor a veto over expenditures, permit the Franchisor to grant any Franchisee an exemption for any length of time from the requirements of membership in and/or the obligation to contribute fully to any Association, and require in their governing documents any restrictions as the Franchisor deems desirable. The Franchisee will join his or her local ADI, regional and national Associations, if and when established by the Franchisor, enter into all governing Association documents and fully perform all Association duties, including paying his or her pro rata share of expenses.

**Section 6.7** **Membership Agreement.**

The Franchisor will provide the Franchisee a membership agreement conforming with applicable state laws required for System Centers operation with the state. The Franchisee acknowledges that all memberships sold by System Centers are the sole property of the Franchisor and will be on consecutively numbered membership agreement forms. The Franchisee is entitled to all monthly proceeds from the membership agreements as collected (less processing fees, Royalty and any payment due the Franchisor under the Franchise Agreement or any other agreement between the Franchisee and the Franchisor) for each month the Franchisee provides System members with services as prescribed within the Manual at the Franchisee's Center. The Franchisee is solely responsible for fulfilling the terms and conditions of the membership agreement for its duration including all services as prescribed in the Manual. The Franchisee is further responsible for notifying the Franchisor if the membership agreement requires modification in order to continuously comply with local, state and federal requirements.

**Section 6.8** **Gross Receipts.**

"Gross Receipts" are all monies and benefits received or receivable due to any business by or for the Franchisee or its Associated Persons in connection with or due to any part of the System or the Franchisee's Center, including all receipts from the payment of registration, membership or monthly fees and dues, as well as all monies received through transactions involving the sale of equipment, t-shirts and clothing, tanning, member identification cards, personal training, vending machine sales, corporate and group memberships, supplements, other goods, services or intangibles sold, leased, used, delivered or rendered at, through or related to the System or the Franchisee's Center, via cash, credit, barter or otherwise, on or off premises or using any way any part of the System's marks, Products, Proprietary Information or other part or item of the System, inside or outside of the Franchisee's Area, business interruption insurance payments and any other related benefits excluding only monies received for sales taxes. Any

money or benefit received by the Franchisee or its Associated Persons as a consequence of or attributable to any activity that is in breach of the Franchise Agreement is also deemed a Gross Receipt, without limiting the Franchisor's remedies therefor. Gross Receipts begin to accumulate immediately and are not delayed until the Center's opening, official or otherwise. Credit transactions (transactions where not all of the agreed payment is received at the time of delivery) are deemed complete when the transaction giving rise to the extension of credit occurs. Refunds actually made due to members canceling their membership within 3 business days of joining as members will be deducted from Gross Receipts. Refunds paid after this period will not be deducted.

**Section 6.9** <u>Money Management</u>.

The Franchisee will pay the monies required by the Franchisee's Money Management Agreement to the Franchisor or the franchisor's assignee.

**Section 6.10** <u>Transfer Fee</u>.

The Franchisee will pay a transfer fee of $5,000 to the Franchisor as a condition of any transfer of the Franchise unless the transfer is by devise or inheritance, is to members of the Franchisee's immediate family, or is to a corporation solely owned by the Franchisee. Notwithstanding, the tender by the Franchisee or initial acceptance by the Franchisor of a transfer fee as provided in this Agreement, any transfer of the license granted by this Agreement will be subject to the terms and requirements of ARTICLE 9 of this Agreement. The payment of a transfer fee as provided in this paragraph is an additional prerequisite to the lawful transfer of the license granted in this Agreement.

**Section 6.11** <u>Payment Terms</u>.

The payment due dates for the monies due the Franchisor for Franchise Fees, Royalties, Advertising Contributions and other Franchisor's goods and services are as stated in the Franchise Agreement and the Manual. If no other due date is agreed on in writing, payment is due on receipt of the subject invoice. Payments must be physically received at the Franchisor's headquarters no later than 5:00 P.M. on the Monday following the close of sales for the previous week or be received there in U.S. dollars by mail or a courier services approved in writing by the Franchisor within 3 days thereafter, postmarked on or before the date due, and be accompanied by the fully and accurately completed standard forms, receipts and other documents as are prescribed in the Manual for a transaction of that type. The Franchisee is absolutely required to make full payment to the Franchisor exactly when due in all instances. Failure to properly and timely deliver any payment due the Franchisor is a material breach of this Agreement. If the Franchisor does not receive the Franchisee's continuing weekly Registration Percentage Royalty when due, the Franchisor may, at the Franchisor's option, collect all or part of the past due Registration Percentage Royalty payment(s) through additional withdrawals from the Franchisee's Money Management Account as part of any subsequent bank draft against the Franchisee's bank account as provided elsewhere in this Agreement and/or in the Money Management Agreement. If the Franchisee becomes obligated to the Franchisor, interest due on all amounts past due at the

highest rate permitted by law on the unpaid balance from the date the underlying payment was due. Entitlement to interest is in addition to the Franchisor's other rights and remedies. If the Franchisee delivers a check that is returned due to insufficient funds or is otherwise not paid,the Franchisor may assess the Franchisee a service charge of $50 or 5% of the face value of the check, whichever is greater, limited to the highest amount permitted by law. Upon the Franchisee's failure to punctually pay any obligation due to the Franchisor, the Franchisor may accelerate that and any other obligations of the Franchisee to the Franchisor, whether under this Agreement or any other agreement, making any obligations immediately due and payable without notice of intent to accelerate or notice of acceleration. The terms of all sales from the Franchisor are fully prepaid F.O.B. point of shipment. The Franchisee will reimburse the Franchisor for all taxes and levies due on transactions with the Franchisee except for taxes based on the Franchisor's net income.

## ARTICLE 7

## RESTRICTIONS

**Section 7.1** **Business**.

Day-to-day conduct of business at the Center and performance of the Franchisee's employees will be controlled solely by the Franchisee and not by the Franchisor. The Center must be open during regular business hours (except for holidays when businesses are normally closed or according to the Lease), and be fully staffed by employees who conform to the Franchisor's performance, cleanliness and attire standards, all as prescribed in the Manual. The Franchisee will operate the System and Center solely for the purposes permitted in this Agreement and not enter into agreements that conflict with his or her obligations to the Franchisor. The Franchisee will offer the System's full line of activities, goods and services as prescribed in the Manual. No other activities, goods or services, whether for profit or not, will be offered or sold at the Center or regarding any part of the System without the Franchisor's written approval. Off-premises and catalog sales are prohibited unless authorized in writing by the Franchisor.

**Section 7.2** **Standards**.

The Franchisee will manage the Center in accordance with his or her own business judgment subject to the restrictions in this Agreement and the standards prescribed in the Manual. The Franchisee acknowledges his or her responsibility to the public and other System franchisees to maintain the System's standards and that the standards in this Agreement and in the Manual are reasonable and necessary. The standards may now or in the future include all requirements, specifications, prohibitions and restrictions for: the Center, the Products and their use; use and protection of Proprietary Information and the Marks; acquisition and use of Products and System services outside of the System or the Franchisee's Area or with nonstandard equipment, services, goods, intangibles, supplies or procedures; marketing, advertising, signs, operations, inventories, supplies, materials, uniforms, improvements, governmental compliance, suppliers, procedures, sales techniques, ordering, paying, selling, maintenance, refurbishing, repairs, alterations, replacement, hiring, training, skill standards, bookkeeping, accounting, data entry and

transmission; and all other matters related to conduct of the franchised business. The Franchisee will comply with the System's standards at the Franchisee's sole expense. The Manual explains and supplements the Franchise Agreement and is binding on the Franchisee except to the extent it contradicts the Franchise Agreement. The Manual will be uniform for all franchisees in each class of franchisees, it being understood that the Franchisor may establish and change classes of franchisees at the Franchisor's discretion, though not more often than once a year. All written additions and revisions to the Manual by the Franchisor become a part of the Manual, effective on receipt by the Franchisee. The Franchisor may change the System, including its Marks, Products, and Proprietary Information, by amending the Manual except that amendments to the Manual that are contrary to the Franchise Agreement are ineffective. The Franchisee will adopt the same at the Franchisee's sole expense. The Franchisee will travel to the Franchisor's headquarters at least twice annually, as reasonably scheduled by the Franchisor, to meet with the Franchisor and compare and conform the Franchisee's Manual with the Franchisor's master Manual. The Franchisor's master manual is the controlling Manual if there are any differences. The Franchisee has read the current Manual and agrees it complies with all of his or her expectations.

**Section 7.3** <u>**Supplies**</u>.

The Franchisee will purchase, inventory, display and promote the System's private label Products from the sources, in the quantities and in the manner prescribed in the Manual. The Franchisee will only acquire, use and sell Products, goods and services for use with the System that have been approved by the Franchisor as meeting the Franchisor's standards, maintain each of the same in sufficient supply as defined by the Manual and only deal with suppliers of the same who demonstrate to the Franchisor's continuing satisfaction and ability to meet the Franchisor's standards and criteria and have been approved in writing by the Franchisor and not thereafter disapproved. Criteria for supplier approval may include type and nature of quality controls, capacity to properly supply System needs, warranties offered, design and appearance, business reputation , financial capacities, experience in supplying the goods and services and the System's need for each approved supplier to be reasonably assured of doing sufficient business with the System to warrant a separate approval and to justify the supplier's compliance with the System. The Franchisee must submit a written request to the Franchisor for approval if the Franchisee desires to purchase any unapproved goods or services or deal with unapproved suppliers. The Franchisee will not purchase from any supplier until and unless the supplier has been approved in writing by the Franchisor. The Franchisor has the right to require, as a condition of approval, that its representatives be permitted to inspect the supplier's goods, services and facilities, that free samples be delivered to the Franchisor for inspection and testing, a reasonable charge be paid to the Franchisor approximating the cost of the inspection and testing and payment of reasonable continuing inspection and administrative costs. The Franchisor may require reinspection of the goods, services and facilities of any supplier and revoke approval upon supplier's failure to meet any of the Franchisor's then current criteria. Nothing in the foregoing requires the Franchisor to approve any particular supplier, good or service. The Franchisor has the right to require the Franchisee to perform substantial changes to the System's Products and methods to come into compliance with the System's then current standards. The System uses or may in the future use certain Products, equipment, fixtures, goods and services and methods that are of particular value

to the System. Because of the importance of maintaining a competitive advantage over competitors, reducing costs, assuring supplies and/or maintaining absolute uniformity or reliability, an exception to all other terms in this Agreement is that the Franchisor may designate any of the same as being restricted, keep the specifications therefor secret, and require the Franchisee to use and sell only designated items and acquire the same only from specific sources designated in the Manual. If the Franchisee disputes the need for any restriction, he or she will submit proposed alternative measures in writing and pay the Franchisor's cost for investigating the appropriateness of providing the restricted items by the proposed measures. The Franchisor's decision thereafter will be final.

Section 7.4 Records.

The Franchisee will create, use, keep and submit all records, documents, data, reports and summaries according to the schedules, forms and requirements prescribed in the Manual and strictly comply with the System's standards concerning procedures, computer software and hardware, data transmission, access and reporting and recording sales, revenues, accounts, customers, costs, inventories, operations, etc., all as prescribed in the Manual. This includes making timely complete daily, weekly, monthly, quarterly and annual records of all Gross Receipts and System and Center activities on System consecutively numbered and issued forms, adopting a certain fiscal year and keeping records at specific points approved by the Franchisor, all as prescribed in the Manual. The Franchisor may require the Franchisee to purchase certain forms, record keeping devices, software or hardware from single designated sources for control and uniformity. The Franchisor may disclose portions of any franchisee's financial information in support of the Franchisor's efforts to add additional franchisees to the System. **The Franchisee must deliver to the Franchisor the prescribed annual financial reports and Federal Income Tax returns signed by the Franchisee's chief financial officer and an outside accountant**. The Franchisee and its Associated Persons will themselves and will instruct their accountants to promptly make all documents and information relating to the Franchisee or its Associated Persons, including original documents and data, working documents, accountant's work product, tax returns, filings, etc., available for inspection, copying and audit if requested by the Franchisor. The Franchisee must timely deliver to the Franchisor the records on the schedules prescribed in the Manual, including contemporaneously delivering copies of all reports and payments sent to or received from all taxation authorities. If the Franchisor discovers that the Franchisee's Gross Revenues have been understated by the Franchisee for any month by more than 2%, then the Franchisee must immediately pay the amount due and the Franchisor's cost of discovering the error, including legal and accounting fees, and for a full audit of the Franchisee's business by the Franchisor's representatives for the prior and immediate fiscal annual periods. This is in addition to any other remedies the Franchisor may have. The Franchisor may inspect, sample, copy, photograph and test the Franchisee's premises, Products, goods, services, items, books, files, drawer, storage areas, records, receipts and all other things and places related to the Center or any business conducted under the System, and observe the Franchisee's operations and confer privately with the Franchisee's personnel and customers, all without prior notice and at any time. The Franchisee will immediately fully cooperate with the same, assist as requested, and instruct all persons to immediately fully and truthfully answer all questions and immediately provide all requested documents and samples without charge.

**Section 7.5** **Ethical Conduct.**

The Franchisee will not allow or engage in unsafe, unlawful or unethical practices, will deal fairly and honestly with each customer, comply with all applicable laws, ordinances, bonds and regulations and maintain all necessary permits and licenses, and rely solely on his or her own attorney's and advisor's advice in all matters. The Franchisee will not engage in any activity that results or may reasonably be anticipated to result in litigation against or public criticism of the Franchisor or the System. The Franchisee will never threaten to breach the Franchise Agreement or indicate to any entity that he or she is not bound by it. The Franchisee specifically agrees that he or she has honestly completed his or her franchise application and has provided the Franchisor with complete, accurate information concerning his or her background, financing, assets, debts, business experience and aptitudes. The Franchisee agrees that the Franchisor's duties under this Agreement are discharged if the Franchisee has not been entirely truthful in these regards. The Franchisee will make these disclosures and sign any additional verification documents as the Franchisor deems reasonably necessary to assure it of the Franchisee's continuing performance of this Agreement. The Franchisee's duties stated in this paragraph are his or her "Ethical Conduct Duties."

**Section 7.6** **Remodeling.**

Not more than once every 5 years the Franchisor may require the Franchisee to perform substantial structural changes, remodeling, replacement and refurbishment of the Center and its equipment, fixtures, decor, furnishings, etc., to bring the Franchisee's Center into compliance with the System's then current standards. Such remodeling costs will not exceed $5,000.

**Section 7.7** **Variances.**

The Franchisor may at any time elect to eliminate, relax or not enforce any restriction or requirement. Any change from the System's standards must be approved by the Franchisor in writing. Other franchisees may operate under different agreements or variances. These do not affect the Franchisee.

## ARTICLE 8

## RELATIONSHIP

**Section 8.1** **Independent Businessperson.**

The Franchisee is an independent business solely responsible for his or her own management, operations, hiring, firing and supervision of employees and procurement, maintenance and disposal of facilities, equipment, supplies and waste. The Franchisee is solely responsible for the selection, retention, performance and evaluation of his or her personnel and may not rely on the Franchisor's suggestion, evaluation or approval of any persons. The Franchisor is in no way responsible for the selection of or the performance, honesty or any other quality of Franchisee's personnel. The Franchisor's duty concerning persons approved, trained

or certified by it, if any, solely comprises having offered them certain identified training materials and experiences and no more. The Franchisee will rely on his or her own independent judgment concerning personnel, day-to-day operations and compliance with all laws, safety standards and practices and not on the Franchisor. The Franchise Agreement's standards and restrictions relate solely to the parties' rights with respect to each other and do not control the Franchisee's actions with respect to the Franchisee's customers, employees or other third parties. Every Franchisee's duty is always subservient to the Franchisee's obligation to the public to do all things necessary for public and employee safety and to comply with all applicable laws, however, for the Franchisee to rely on this exemption, the Franchisee must specifically point out any problem to the Franchisor's President, referring to this clause, in writing as soon as the problem is apparent before taking any action thereon, unless time constraints preclude prior written notice, in which case, the Franchisee must inform the Franchisor in writing of the problem and the Franchisee's action in response thereto as soon thereafter as possible. If the Franchisor disagrees with the Franchisee's assessment of the problem or believes that the problem should be dealt with in some other fashion, the Franchisor may submit the dispute to arbitration as stated in this Agreement. Nothing contained in this Agreement will be construed to give the Franchisor or any combination of entities the right to control the Franchisee's prices. The Franchisee agrees to always independently set his or her own prices and to not enter any agreement that unlawfully affects the prices of others. The Franchise Agreement does not create an agency, partnership, joint venture or fiduciary relationship between the Franchisor and the Franchisee. The Franchisee will not represent himself or herself as an agent, representative, partner or employee of the Franchisor and will make no promises or representations concerning the Franchisor. The Franchisor is not liable under any circumstance for any act, omission, contract, debt or any other obligation of the Franchisee.

**Section 8.2** **Franchisee Corporation**.

The Franchisee may incorporate if: the corporation's articles state that its activities are confined exclusively to operating one or more franchised businesses in accordance with the Franchise Agreement and that all share certificates show a legend approved by the Franchisor stating that transferability is restricted by the Franchise Agreement. The corporation may not have more than 15 shareholders, enter any agreement affecting control of the franchisee or permit the number of outstanding shares to be increased, transferred, impaired or used as collateral without the Franchisor's written consent. The Franchisee will deliver to the Franchisor updated copies as changes occur of the corporation's articles, bylaws, minutes, amendments, and documents that identify the corporation's shareholders, shares owned, officers and directors. The Franchisor may condition its consent to incorporation on, or at any time require, personal guarantees in a form satisfactory to the Franchisor of all shareholders and proposed shareholders for the Franchisee's performance hereof.

**Section 8.3** **Proprietary Information.**

The Franchisee expressly agrees he or she will receive training and Proprietary Information under the Franchise Agreement. Any use, disclosure, copying or appropriation of Proprietary Information or any part of the System for any purpose not expressly permitted in this Agreement causes immediate, great and irreparable injury to the System, the Franchisor and other franchisees. The Franchisee, his or her successors nd assigns, all persons signing with or for the Franchisee, its managers, officers, directors, shareholders, partners, limited partners, holders of a 5% or greater beneficial interest in the Franchisee and those of his or her employees and agents who have access to any Proprietary Information (collectively "Associated Persons") have a confidential relationship with the Franchisor concerning its Proprietary Information. Proprietary Information and all documents containing the same always belong solely to the Franchisor and will not be used, disclosed, copied or appropriated during or after the duration of the Franchise Agreement without the Franchisor's written consent. The Franchisee will maintain the Proprietary Information in the strictest confidence, not permit any part of it to be reproduced, comply with any confidentiality program implemented in the Manual and require all Associated Persons and, at the Franchisor's request, all employees and agents, to sign confidentiality and noncompetition agreements on the Franchisor's forms and forward duplicate originals thereof to the Franchisor. Any document received from the Franchisor bearing any of the Marks is and always remains the Franchisor's sole property and will not be used, disclosed, copied or appropriated without the Franchisor's written consent. On termination, the Franchisee will immediately return all originals, copies and derivative works of the Manual and other materials containing any Proprietary Information or bearing any of the Marks and not retain any items with the exception of the Franchisee's copy of the Franchise Agreement, correspondence between the parties and any documents that the Franchisee needs to comply with any law. The Franchisor has no adequate remedy at law if any breach or threatened breach by the Franchisee or its Associated Persons of the Franchise Agreement or any confidentiality or noncompetition agreement or any confidential relationship concerning Proprietary Information, and is entitled, without showing actual damages or placing any bond, and in addition to other remedies, to an immediate injunction prohibiting any conduct in violation thereof. The Franchisee unconditionally guarantees that its Associated Persons, employees and agents will comply with any agreements they enter into with the franchisor, which agreements the Franchisee has notice of.

**Section 8.4** **Restrictions.**

Because of the personal confidence of the Franchisor in the Franchisee and its Associated Persons, the training, investments and disclosures of the Franchisor, and the need for the Franchisee and its Associated Persons to devote their attention to the System, certain restrictions are necessary to induce the Franchisor to enter the Franchise Agreement. The Franchisee and its Associated Persons will promptly and fully disclose to the Franchisor all business and marketing information and contacts with existing or potential System franchisees, suppliers, distributors, customers or competitors and will for the duration of the Franchise Agreement and 2 years after its termination: not have a direct or indirect interest (as an officer, director, partner, investor, shareholder, employee, agent or otherwise) in any business that engages in the same line of commerce as does the Franchisee's Center or appropriates any protectable part of the System or

competes with any System Center, where the business is located or operating in whole or part within the Franchisee's Area, the county and ADI where the Franchisee's Center is or was located or within any other system Center's Franchisee area, county or ADI, or within any county or ADI where the Franchisee has reason to believe a System Center will begin operating within 1 year from termination of the Franchise Agreement; not employ or seek to employ any person who is or has been employed by the Franchisor or a System Center during the preceding 6 months or otherwise, directly or indirectly, induce any person to leave their employment therewith; not have a direct or indirect interest in any entity with whom they know the Franchisor was, is or will be negotiating to sell or license any System right; and not divert or attempt to divert any business or customer from the Franchisor or any System Center or do any act injurious to the System's goodwill. If the Franchisee commits any act in violation of these restrictions or if implementation of the restrictions is stayed by any court or arbitrator, the time period of these restrictions will be tolled during the pendency of the violation or stay. The Franchisee will promptly make full written disclosure to the Franchisor of all changes, developments, derivative works and improvements reasonably related to the System, and hereby assigns them to the Franchisor if made during the life of the Franchise Agreement. All intangible rights and goodwill crated during the duration of the Franchise Agreement for use with the system or the Center including, the Franchisee's own marks, trade names, trade dress, right of publicity, copyrightable works, etc., are assigned to the Franchisor and always belong solely to the Franchisor. The Franchisee will additionally sign all documents the Franchisor deems useful to confirm any of the above and on request, place the Franchisor's copyright notice on all works and copies of the same. The Franchisor may enforce any rights granted it under law. All supplier information, membership information, membership records and membership agreements that are related to use of the System at the Center are part of the System, are assigned to and owned by the Franchisor and must not be used by the Franchisee after termination. The Franchisee may apply to the Franchisor for permission to continue to use improvements made by him or her if the Franchise Agreement is terminated provided the Franchisee does not represent thereby that he or she is associated with the System or violate the Franchisee's other obligations to the Franchisor. If the same are valuable enough to cause additional distinct fees to be paid to the Franchisor by third parties for a license thereto, the Franchisor will apportion one-half of these additional fees to the Franchisee.

## ARTICLE 9

## TERM, TRANSFER AND TERMINATION

**Section 9.1** **Term and Renewal**.

The Franchise Agreement has a primary term of 10 years. The Franchisee has an option to renew the Franchise Agreement, as stated in this Agreement for 1 additional 5-year renewal term, by delivering written notice to the Franchisor of his or her intention to do so not less than 12 months nor more than 18 months before each expiration date. Renewal will be on terms then being currently offered by the Franchisor to potential franchisees in that state, except that a franchisee fee will not be required as a condition of renewal. The Franchisee's renewal notice, however, will be delivered together with a renewal fee of 10% of the Franchisor's then current standard fee for a new franchise. Renewal is subject to the Franchisee completing to the

Franchisor's satisfaction the remodeling, refurbishing, training, acquisition of new or different Products or services, and other changes required by the Franchisor to bring the Franchisee into compliance with the System's then current standards within 6 months of the Franchisor's notice thereof and the Franchisee's strict compliance with the Franchise Agreement and Manual during the prior term. Failure to give proper notice is a knowing waiver of any right to renew. Renewal will be on terms then being currently offered by the Franchisor to potential franchisees in that state. The terms of the renewal Franchise Agreement may be materially different than those in this Agreement, including additional and greater payments, royalties, fees and contributions by the Franchisee, and may materially change portions of the System. The Franchisee and all of its shareholders, partners and spouses thereof must sign the new Franchise Agreement and a general release of all claims against the Franchisor and its personnel to obtain renewal. Uncontested operation without a written renewal is under the terms of this Agreement and is terminable at will by whether party upon 90 days' written notice.

**Section 9.2** **Transfer.**

A material part of the consideration hereof is the Franchisor's personal confidence in the Franchisee, the individuals and entities signing with or for the Franchisee and the owners of interests in the Franchisee. Neither the Franchisee, nor any owner of any interest in the Franchisee, may directly or indirectly transfer any part of the Center, the franchised business or any right or duty under this Agreement without the Franchisor's written consent, not to be unreasonably withheld. The Franchisor has the right to reasonably disapprove any person or entity that would acquire any part of legal or effective control of the Franchisee or any interest in the Franchisee. Before the Franchisee or any owner of any interest in the Franchisee enters into any sale, conveyance, assignment, sublicense, division, delegation, pledge, succession, gift, encumbrance, management agreement, security agreement or any other act, by operation of law or otherwise, that has or could have the effect of changing any of the ownership, management or control of the Franchisee, any interest in the Franchisee or a substantial part of the Franchisee's assets (collectively, "Transfer") the Franchisee must give 60 days' written notice thereof to the Franchisor. The notice must identify what is to be transferred, the proposed transferee and all terms and conditions thereof. The Franchisor has an irrevocable right of first refusal for 60 days to itself enter the proposed agreement on like terms or their reasonable equivalent in cash. Any material change in the terms of any offer comprises a new offer subject to the Franchisor's right of first refusal. The Franchisor may: (a) require deposit by the proposed transferee of 10% of the total proposed consideration in the Franchisor's escrow account during the 60-day period to insure bona fideness; (b) obtain the Franchisor's written approval of the proposed transferees or successors (approval contingent on their personally meeting with the Franchisor at its headquarters, satisfying high financial, business reputation, credit rating, ability and ethical standards, receipt of all normally required transferee data and meeting the Franchisor's then current criteria for new franchisees and providing the Franchisor adequate assurance that the transferee will successfully operate the franchise business); (c) pay all amounts then due and fully prepay all notes or other agreements to pay monies over time to the Franchisor, entities associated with the Franchisor, entities to which the Franchisor has guaranteed payment by the Franchisee, all System Associations and all advertising obligations; (d) sign a general release of all claims against the Franchisor, its affiliates, officers, directors, employees and agents in a form

satisfactory to the Franchisor and guarantee the transferee's performance for a period equal to the remaining term of the Franchise Agreement and one renewal thereof; and (e) obtain from the transferees, their signing of the Franchisor's then current Franchise Agreement for the remainder of the Franchise Agreement's terms and renewals, which agreement may be materially different than the Franchise Agreement, including additional and greater payments, royalties, fees and contributions and the Franchisor's other then current standard ancillary agreements, assumption by the transferees of all of the Franchisee's liabilities related to the Franchise Agreement on forms satisfactory to the Franchisor and agreement by them to upgrade the licensed business to the Franchisor's then current standards and to complete any training the Franchisor may require at their sole expense. If the transferee is a member of the transferor's immediate family, then restrictions (a) and (c) do not apply. If the transferee is a corporation or partnership, all its shareholders and partners must co-sign as individual guarantors. Any interest in the Franchise Agreement is always subject to these provisions. An unauthorized Transfer is voidable by the Franchisor and comprises a general release of all claims against the Franchisor, its affiliates, officers, directors, employees and agents. The Franchisor may require the Franchisee to pay a non-refundable fee in an amount necessary to reimburse the Franchisor for its costs and expenses, including legal and accounting fees, associated with the proposed Transfer.

**Section 9.3** **<u>Death or Incapacity</u>.**

Within one year of the death or mental incapacity of the Franchisee or any person with an interest in the Franchisee, the executor, administrator or personal representative of that person will transfer his or her interest to a third party approved by the Franchisor. Any Transfer will be subject to the same conditions as any inter vivos Transfer except that if the transferee is a member of that person's immediate family, then no Transfer restrictions apply except that the transferee must sign the Franchisor's then current franchise agreement for the Franchise Agreement's remaining term and attend and complete System training to the Franchisor's satisfaction. The Franchisor may terminate the Franchise Agreement if the interest is not timely disposed.

**Section 9.4** **<u>Offerings by the Franchisee</u>.**

An additional limitation on Transfers is that the Franchisee may make public or private offerings of securities or partnership interests only with the Franchisor's written approval. The offering will not imply, by using the Franchisor's Marks or otherwise, that the Franchisor is participating in any way with the offering and will make clear that the Franchisor's review of it is limited solely to the relationship between the Franchisor and the Franchisee. The Franchisee must submit to the Franchisor all materials required for the offering, whether the same are submitted to governmental authorities or not, at least 60 days before use or filing, and pay the Franchisor a non-refundable fee of an amount necessary to reimburse the Franchisor for its costs and expenses, including legal and accounting fees associated with the proposed offering.

**Section 9.5** **<u>Substitute Performance</u>.**

The Franchisor has the right, but not the obligation, to elect to perform the Franchise Agreement on the Franchisee's behalf, including the right to enter and remove, modify, alter,

repair or replace any item or aspect of the franchised business that does not meet the System's then current standards. If the Franchisor asserts the Franchisee has materially breached the Franchise Agreement, the Franchisor may elect to immediately exclude the Franchisee from the Center and take full control of the Center as the Franchisee's trustee for as long as reasonably needed to obtain a final binding resolution of the issue, whether by judicial action, arbitration or otherwise, take any action the Franchisor deems useful to cure the breaches and charge a reasonable fee for the Franchisor's time and expenses. The Franchisor has no liability for the acts or management unless the Franchisee shows the same was maliciously done by the Franchisor.

**Section 9.6** **Insolvency**.

The Franchisee is in default and all rights granted in this Agreement to the Franchisee automatically terminate without notice to the Franchisee if the Franchisee becomes "Insolvent," defined as: voluntarily suspending normal business operations or becoming unable to pay debts as they mature; failing to pay all debts as they come due; the Franchisee is adjudicated bankrupt or insolvent; a receiver or other custodian (permanent or temporary) of the Franchisee's assets or property, or any part thereof is appointed by any court; proceedings for a composition of creditors is instituted by or against the Franchisee; the Franchisee makes a general assignment for the benefit of creditors; a petition of bankruptcy is filed by the Franchisee; a petition in bankruptcy is filed against the Franchisee and is not opposed by it; a final judgment against the Franchisee remains unsatisfied for 30 days (unless a supersedeas bond is filed); the Franchisee is dissolved; execution is levied against the Franchisee's property or business; or any suit to foreclose any lien or mortgage against the premises or equipment of the Center is not dismissed within 30 days of institution.

**Section 9.7** **Breach**.

Maintaining the System's standards, goodwill, Marks and Proprietary Information is essential for continued growth and profitability of the System, protection of other System franchisees and meeting the public's expectations. The terms of the Franchise Agreement are reasonable and essential. Upon any default in performance by the Franchisee, the Franchisor may elect to deliver a notice of intent to terminate specifying the default and a date at least 30 days hence by which the Franchisee may avoid termination by curing the default to the Franchisor's satisfaction which notice of intent to terminate will become effective without further notice to the Franchisee according to its terms if not timely complied with. Defaults comprised of the Franchisee's insolvency or a substantial material breach are exceptions to this procedure as described in Section 9.7. Each of the following events is a substantial material breach and termination therefor by the Franchisor delivering notice of termination to the Franchisee without notice or opportunity to cure is deemed to be for good cause and will be effective upon the date stated in this Agreement and according to its terms: Franchisee uses any unapproved Products, equipment, supplies, goods or services in connection with the Center or any part of the System, maintains or submits false records, effects or attempts to effect a Transfer in violation of the Franchise Agreement, breaches the Franchise Agreement 3 or more times in any 12-month period, loses the right to possession of the Center's premises (provided that the premises are damaged or destroyed, the Franchisee has 60 days to relocate or reconstruct), forfeits the right to transact

business in the Center's jurisdiction, commits the same default twice in any 12-month period, discloses any Proprietary Information in violation of the Franchise Agreement, disrupts or attempts to disrupt the standard operation of the System's Money Management Agreement in any way (including directing any System member or dues processing company to send money in any manner to any recipient other than as approved by the Franchisor), becomes incapacitated or unable to fully operate the business, breaches any of his or her Ethical Conduct Duties or is convicted or pleads *nolo contendere* to criminal misconduct relevant to operation of the system or to any felony; or the Franchisee fails to do any of the following: to completely and accurately record all business and deposit all monies as required by the Franchise Agreement and the Manual; to timely pay all monies and deliver all required complete accurate records to the Franchisor exactly when due; to affirmatively protect the System, its Marks, Proprietary Information and reputation; to maintain all Products, equipment and inventories as required by the Franchisor; to timely pay all his or her debts and liabilities specifically including landlords, suppliers, employees, taxing authorities, insurers, media, Associations and the Franchisor; to use the Center solely for operation of the System; to maintain the required insurance and workers' compensation coverage, to comply with any law, rule, regulation, ordinance or order relating to the operation of the Center; to supply complete, accurate information pursuant to the Franchisee's application for this franchise and operation of the Center; to permit any audit or inspection caused by the Franchisor and permit access by the Franchisor to any part of the Center, or its records; to maintain the Center's full operations for all required time periods; to strictly and completely comply with all terms in the Franchise Agreement and in the Manual as it may be revised from time to time; or to prevent any threat to public or employee health or safety due to the Franchisee's operations.

**Section 9.8** **Acquisition**. Sale?

Upon any notice of termination or intent to terminate, the Franchisee will immediately supply the Franchisor with copies and lists of all tangible and intangible rights and assets related to operation of the franchised business, specifically including all supplier, customer and employee agreements, address lists, customer lists and records, Site leases or other leases, inventory, equipment fixtures, supplies, furnishings, books, records, past and current tax returns, real property, indoor and outdoor signs and telephone lists (all collectively, "Property"). The Franchisor may, at its sole option, acquire any or all of the Property until 60 days after the Franchisee supplies the Franchisor with complete copies and lists. These acquisitions immediately vest all legal and equitable title and rights to the acquired Properties solely in the Franchisor. The Franchisee immediately ceases to have any rights in the acquired Properties other than for compensation as stated in this Agreement. The Franchisee will immediately sign any assignments or other documents convenient to giving full useful effect and benefit to these transfers and permit the acquired Properties to be immediately occupied or removed. If no price is agreed on for an assumed Property, the price will be the depreciated value shown on the Franchisee's last federal income tax return, or if not listed on the tax return, the lower of cost less straight line depreciation over its useful life without any allowances as determined by an independent appraiser selected by the Franchisor or, if rented or leased, assumption of payment obligations for its possession subsequent to acquisition. No value will be attributed to goodwill, value as a going business, equity or any other measure. As between the Franchisor and the Franchisee, the Franchisor will never be liable for any of the Franchisee's liabilities, except for leases that the Franchisor

acquires, even if the Franchisor acquires the entire business. The Franchisor will pay each acquisition price 90 days after each item is given over to the Franchisor's full use, possession and benefit. The Franchisor may set off against the prices any amounts due from the Franchisee to the Franchisor or to any Franchisee creditor to which creditor the Franchisor applies the funds. All accounts payable and all accounts currently receivable of the Center upon termination belong to the Franchisee. The Franchisee expressly agrees that all memberships and membership agreements sold by him or her are memberships in the system and agreements solely owned by the Franchisor. The Franchisee's Center is only one of many System Centers that offer the System services obtained by the member. Upon termination, all members and membership agreements remain with the Franchisor. The Franchisor has no duty to pay the Franchisee for the same. If the Franchisee is a corporation, the Franchisee and all shareholders thereof will be deemed to have granted the Franchisor an irrevocable option to purchase any or all shares of its issued or unissued stock at par value for one year from the date of termination. The Franchisee expressly agrees that upon termination, the Franchisor may immediately take sole possession of the Center, change its locks and exclude the Franchisee subject to thereafter timely electing in writing to acquire or not acquire any or all of the personal property at the Center. The Franchisee expressly agrees to immediately assign any or all telephone numbers associated with the business to the Franchisor or its designee if the Franchisor so elects within 90 days of termination. The Franchisor's assumption of future payment obligations will be the sole payment therefor. The telephone company and any court will accept the Franchise Agreement as conclusive proof of the Franchisor's exclusive right to the telephone numbers without any interference whatsoever. No interrupts or operator messages will be required on the telephone lines assigned to the Franchisor. The Franchisor may elect to not acquire these telephone numbers, and in that event, the Franchisee will either discontinue the numbers or solely pay for an operator interruption service for one year to inform callers of the Franchisee's disassociation with the Franchisor and of how to contact other system Centers. The telephone company is an intended beneficiary of these provisions.

**Section 9.9** **Termination.**

If applicable law requires certain notices or procedures before termination, then any expiration as termination that does not comply with the same is deemed a notice of intent to terminate only and this Agreement remains in effect on a month-to-month basis until the applicable law's notice provisions have been complied with. On termination, all rights granted to the Franchisee under this Agreement immediately terminate and the Franchisee will immediately and permanently cease to represent himself/herself as being associated with the Franchisor; discontinue all use of the System, the Marks and any similar marks, logos or indicia, its copyrighted materials and Proprietary Information; specifically including immediately modifying or removing any reproduction or colorable imitation of the Marks that is likely to cause confusion or mistake or to deceive; discontinue use of any trade dress, designation of origin, description or representation that falsely suggests or represents an association or connection with the Franchisor, including immediately modifying exterior, interior, fixtures, furniture, equipment and operations and techniques to completely distinguish its appearance, image, operations, services and goods from that of the System; cause its governing documents and all licenses, permits and contracts to be amended to delete all parts of the system Marks; and abide by all confidentiality, noncompetition and noninterference covenants with the Franchisor. The Franchisor has the right to immediately

enter the premises where the licensed business was conducted, without being guilty of trespass or any other tort, and effect the above at the Franchisee's expense. The Franchisee will immediately pay the Franchisor all monies then due and fully prepay any notes or other agreements to pay monies over time to the Franchisor, entities which have a controlling interest in the Franchisor or in which the Franchisor has a controlling interest, or to which the Franchisor has guaranteed payment by the Franchisee, irrespective of other terms concerning time of payment. The Franchisee will assist in either amicably winding up its business or transferring it to another at the election of the Franchisor. If the Franchisee has any leases, subleases or similar agreements with the Franchisor, the Franchisor may lawfully terminate them without liability. Termination of any Franchise Agreement between the Franchisor and the Franchisee due to any cause other than expiration of term is, at the Franchisor's option, good cause for the Franchisor terminating the Franchise Agreement and/or any or all of any other agreements the Franchisor may have with the Franchisee without any liability by the Franchisor to the Franchisee, any parties hereto or any third parties. If the Franchise Agreement is terminated by the Franchisee or is terminated by the Franchisor due to a breach by the Franchisee, the Franchisee will pay the Franchisor the Royalties and Advertising Contributions that the Franchisee would have paid if the Franchisee had fully complied with the Agreement through the end of its term together with all other damages, costs and expenses, including attorney's fees, incurred by the Franchisor as a result thereof. This is in addition to any other relief to which the Franchisor may be entitled.

## ARTICLE 10

## OTHER TERMS

**Section 10.1** **Insurance**.

The Franchisee will obtain before any construction, remodeling and occupancy and thereafter maintain at his or her expense, insurance coverage at least equal to the minimum insurance standards and requirements stated in the Manual, including naming the Franchisor as an additional insured, providing that the Franchisor will receive at least 30 days' written notice of any changes, terminations, obtaining the insurance only from insurance companies that meet the Franchisor's standards, etc., the Franchisee will deliver to the Franchisor the evidence of insurance and its maintenance as required by the Manual. The Franchisee will not make any claim against the Franchisor or any entity performing any duty for the Franchisor to recover any loss covered or which should have been covered by the insurance. The Franchisor, at its option, may obtain the insurance and/or make payments necessary to keep the insurance in force if the Franchisee fails to do so and the Franchisee will immediately reimburse the Franchisor for these payments. The Franchisee's obligations are not reduced because of any insurance the Franchisor may carry, nor will any insurance relieve the Franchisee of liability under the indemnity provisions in this Agreement.

**Section 10.2 Survivability.**

The Franchisee's obligations in this Agreement concerning confidentiality, nondisclosure, nonuse of Marks and Proprietary Information, noncompetition, arbitration and all other obligations which, by their terms express or imply that they are intended to survive expiration or termination of this Agreement, will survive termination of this Agreement unless this clause is particularly and expressly identified in a separate signed document. The Franchisee expressly agrees that neither termination nor the existence of claims by him or her against the Franchisor is a defense to the Franchisor's immediate enforcement of these obligations and that they are covenants independent of any other portion of the Franchise Agreement.

**Section 10.3 Sales.**

The Franchisor believes it has all rights to the System and Products necessary for its performance of the Franchise Agreement. The Franchisor will assign to the Franchisee any warranties it has received from manufacturers to the extent contractually permitted. The Franchisor warrants to the Franchisee to repair or replace any Product manufactured by the Franchisor which is purchased directly from the Franchisor and proves to be defective in workmanship or material, all in accordance with its then current published warranty policy. THE FOREGOING IS IN LIEU OF ALL EXPRESS WARRANTIES AND REPRESENTATIONS AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. THE FRANCHISOR MAKES NO OTHER AFFIRMATIONS OF FACT, PROMISES THAT ARE A BASIS OF THE BARGAIN OR EXPRESS WARRANTIES EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT. The Franchisor makes no warranties concerning the goods or services of approved suppliers whether they be listed as an approved supplier or be otherwise recommended by the Franchisor or concerning goods purchased from the Franchisor, but which were not manufactured by the Franchisor. These sales are "AS IS" with respect to the Franchisor. The Franchisor is not liable for consequential or incidental damages, transportation, labor or any other charges due to any goods or services. All sales, leases or transfers of goods or services from the Franchisor to the Franchisee are governed by the Franchise Agreement unless otherwise agreed in writing. The Franchisee has inspected all available goods, services and specimens of the Franchisor and has found them to be in complete conformity with the Franchise Agreement and the Franchisee's expectations.

**Section 10.4 Claims and Indemnity.**

The Franchisee will immediately notify the Franchisor in writing of any suits or threats concerning, arising from or relating to the System or the Center and of all claims or complaints made against the Franchisee, the Franchisor or any part of or aspect of the System, its Marks, employees, agents, Products or services, together with a full explanation of the situation. Methods of channeling customer complaints, governmental investigations or publicity about the Center directly to the Franchisor may be implemented in the Manual. The Franchisee will actively assist the Franchisor to prosecute or defend the Franchisor's claimed rights in the System, not take any action in derogation of the same, immediately report to the Franchisor any infringements of this Agreement and cooperate fully and sign any papers useful to accomplish these purposes at the

Franchisee's expense. The Franchisee indemnifies and holds the Franchisor, its affiliated companies, officers, employees and agents and other System franchisees harmless from all damages and expenses, (including attorney's fees, expenses and any payments made by the Franchisor in satisfaction of nonfrivolous complaints) fines, claims, actions or demands of every kind and character, for injury to or death of any person or damage done to any property arising directly or indirectly or allegedly arising from the Franchisee's or his or her contractor's, subcontractor's or their respective employee's or agent's work, offer, sale, lease or transfer of any good or service, or any part of the Franchisee's business, including where any injuries, death or damages are caused by the sole, joint or concurrent gross or simple negligence of the Franchisor, its officers or employees. If the unresolved customer complaints, litigation or any governmental litigation or investigatory request or demand based in whole or part upon the Franchisee's alleged acts of failures to act, the Franchisor may elect upon giving written notice to the Franchisee to take whatever action the Franchisor deems appropriate in the Franchisee's name to resolve the matters, including controlling and/or settling claims and litigation, making payments in satisfaction of complaints and agreeing to undertake corrective measures, all in the Franchisee's name and at the Franchisee's expense. The Franchisor owes a duty to the Franchisee to use the Franchisor's reasonable business judgment with respect to these matters as it elects to control and owes the Franchisee no other duties. The Franchisee is always solely responsible for his or her costs, attorneys' fees, damages and settlements. The Franchisor may in its sole discretion take whatever action it deems appropriate with regard to patent, trademark, copyright or unfair competition claims, including controlling and/or settling litigation and instruct the Franchisee to adopt substitutes chosen by the Franchisor at the Franchisee's expense. The Franchisee will indemnify and hold the Franchisor harmless for all costs, expenses or losses incurred by the Franchisor in enforcing the provisions of the Franchise Agreement or upholding the proprietary of any action or determination by the Franchisor relative to the Franchisee or arising from the Franchisee's failure to perform any obligation under this Agreement, including reasonable attorney's fees and expenses, including compensation for the time of the Franchisor's corporate attorneys, in connection with any pre-litigation, arbitration or litigation work thereon, unless the Franchisee is finally determined to have fully complied with the Franchise Agreement.

**Section 10.5** <u>Limitations</u>.

THE FRANCHISEE MUST DELIVER A WRITTEN NOTICE TO THE FRANCHISOR WITHIN 90 DAYS OF BEGINNING OPERATIONS UNDER THE FRANCHISE AGREEMENT OF ANY PRE-OPERATIONAL BREACHES OR MISREPRESENTATIONS OF THE FRANCHISOR OR IS DEEMED TO HAVE WAIVED THE SAME FRANCHISEE WILL CAREFULLY MONITOR THE ACTIVITIES OF THE FRANCHISOR AND DELIVER A WRITTEN NOTICE TO THE FRANCHISOR OF ANY OBJECTIONABLE ACT, FAILURE TO ACT, STANDARD OR PRACTICE OF THE FRANCHISOR WITHIN 90 DAYS OF THE FIRST OCCURRENCE THEREOF OR IS DEEMED TO HAVE WAIVED ANY OBJECTION AND CAUSE OF ACTION WITH RESPECT THERETO AND TO ALL FUTURE SIMILAR OCCURRENCES. THE FRANCHISEE WILL FILE SUIT AGAINST THE FRANCHISOR WITHIN 2 YEARS OF THE FIRST OCCURRENCE OF ANY BREACH OF CONTRACT OR TORTIOUS ACT OF THE FRANCHISOR INCLUDING FRAUD, MISREPRESENTATION, STATUTORY TORTS, NEGLIGENCE, PROMISSORY ESTOPPEL AND ALL ACTIONS

HOWEVER DENOMINATED OR IS DEEMED TO HAVE WAIVED THE SAME AND ANY OBJECTION TO ALL FUTURE SIMILAR OCCURRENCES. IF THE FRANCHISEE PURCHASES ANY GOODS OR SERVICES FROM THE FRANCHISOR HE OR SHE WILL DELIVER WRITTEN NOTICE OF ALL DEFAULTS TO THE FRANCHISOR WITHIN 90 DAYS OF DELIVERY. FAILURE TO TIMELY DELIVER THE NOTICE COMPRISES AN IRREVOCABLE ACCEPTANCE AND BINDING ADMISSION THAT THE GOODS AND SERVICES FULLY COMPLY WITH THE ORDER AND ARE FIT FOR THEIR INTENDED PURPOSE. These limitations are reasonable and intended to promote the early disclosure of problems to permit them to be resolved in a timely manner rather than becoming the basis of expensive, time consuming litigation at a later date. If the Franchisor is held liable to the Franchisee for material breaches of the Franchise Agreement or for any material acts or failures to act related to this Agreement, the parties agree that liquidated damages, therefore, will be a credit to the Franchisee of 1/3 of all Royalties paid from the affected center during each calendar year of the breaches (limited to 2 years) against future royalties to be paid by the Franchisee or, if the Franchisee ceases to be a Franchisee of the Franchisor, return to the Franchisee this amount. If the Franchisor is held liable to the Franchisee for a substantial material tort which caused the Franchisee to purchase this franchise, the liquidated full remedy therefor will be the return of the Franchisee's franchisee fee and of the Royalties paid by the Franchisee during the Franchisee's first year of operation. These are the Franchisee's sole remedies, are in lieu of all other relief of any kind, are reasonable sums considering the range of possible problems, and are adopted to lessen the expense and uncertainty of litigation and to promote its early settlement or resolution.

**Section 10.6** **<u>Orders</u>.**

All purchase orders received by the Franchisor are subject to acceptance by the Franchisor as stated in this Agreement. The Franchisor has the right to not accept new orders and to withhold shipment of accepted orders if the Franchisee is in any way in default under this Agreement, specifically including failure to pay any sum due the Franchisor. The Franchisor may change prices without advance notice. Franchisor quotes, price lists, etc., are invitations to submit orders and no more. Any provision included by the Franchisee in any purchase order that is inconsistent with the Franchise Agreement or the Franchisor's standard terms of sale is ineffective. The Franchisor is under no obligation to examine the Franchisee's orders except to determine items and quantity. The Franchisor reserves the right to reject any order. Absent a separate written notice of acceptance only shipment by the Franchisor comprises acceptance of the Franchisee's order and then only to the extent of goods shipped and no more. All the Franchisor's sales and quotations are subject to the Franchise Agreement unless this clause is specifically referred to and negated in a subsequent signed agreement. Additional specific terms and conditions of ordering, shipment, delivery and payment may be implemented in the Manual as it may be changed. The Franchisee's exclusive remedy for all causes relating to delivery, quantity and quality of goods is for refund of the monies paid for the goods and is conditioned on timely giving notice of rejection, holding the goods for the Franchisor's inspection and a finding that the goods were defective when delivered. While the Franchisor will use reasonable efforts to fill the Franchisee's orders, it cannot guarantee that they will be timely or completely filled or filled in a single shipment as the Franchisor does not now, nor does it plan in the future, to warehouse sufficient goods to immediately supply all System franchisees. The Franchisor reserves the right to allocate scarce

goods in its unreserved discretion. The Franchisee agrees he or she must order sufficiently in advance of his or her needs and have adequate stocks on hand to avoid shortages. The duty to avoid these potential problems is solely the Franchisee's.

**Section 10.7** **Impossibility**.

If performance of the Franchise Agreement is hindered or prevented by act of God, enactment of legislation or governmental order or regulation, lack of supplies, labor unrest or unavailability, shortages, transportation delays, or unexpected demand, the requirement of performance will be extended, to the extent so prevented.

**Section 10.8** **Accord and Satisfaction**.

Payments by the Franchisee to the Franchisor of any amount less than due are deemed payments on account regardless of any endorsement to the contrary. Endorsing any check or accepting any amount from the Franchisee will not bind the Franchisor to any endorsement or any claim that acceptance was an accord and satisfaction for less than the full amount due or to any other condition. Payments from the Franchisee will be applied first to any interest owing to the Franchisor and then to the earliest amounts due the Franchisor.

**Section 10.9** **Representations**.

The Franchisee has visited operational System Centers, carefully studied the Franchisor's System, the disclosures made in the Franchisor's Franchise Offering Circular and the terms and conditions in this Agreement. The Franchisee specifically agrees that the Franchisor has not represented, promised or implied that the Franchisor will buy back or is likely to buy back any Products, supplies or equipment or any Product made, produced or fabricated by the Franchisee using in whole or in part any Products, supplies, equipment or services sold or leased or offered for sale or leased to the Franchisee by the Franchisor. The Franchisee has been specifically advised that he or she must have enough money on hand to pay all opening expenses and for the period it will take for the business to become profitable, if ever. The Franchisee represents and promises that the Franchisee is and will remain financially able to make all payments needed to open and maintain the Center as required in this Agreement. The Franchisee and all persons signing with or for it hereby release the Franchisor, his or her officers, directors, employees and agents from any causes of action that have arisen to date in exchange for the Franchisor's grant of rights in this Agreement. The Franchisee has examined an operational Center, the Manual, the System's Products, specifications, training materials and schedules, samples of its Products, all material aspects of the System and its Franchisee's Area and agrees that all of these items comply with the Franchise Agreement, all representations and his or her expectations. The Franchisee acknowledges and agrees that his or her earnings, if any, will be primarily determined by the demand in his or her Franchisee's Area, the efficiency with which he/she operates his or her business, his or her competition, his or her efforts and his or her business skills; that markups, costs and sales volumes are different at every location and are subject to fluctuations; and that his or her actual sales margins, profits, losses, etc., may differ substantially from any figures he/she may have seen from any source.

**Section 10.10** Security and Guaranty.

At the Franchisor's request the Franchisee will provide proof that the individuals signing on its behalf have authority to do so. Each of the persons signing for the Franchisee warrants that he or she has full authority to sign the Franchise Agreement as indicated. The Franchisee hereby grants the Franchisor a security interest in the Center and his or her business, realty, fixtures, inventory, receivables, equipment, all tangible and intangible property and all signs or documents bearing any part of the Marks including after acquired property and all proceeds of any collateral to secure the Franchisee's obligations under this Agreement. The Franchisee will additionally sign all other security agreements and documents useful to further or perfect this security interest including UCC-1 forms. The Franchisee will not remove any of the secured property from the premises without the Franchisor's written consent, which will not be unreasonably denied. Each individual signing as a guarantor of the Franchisee's performance under this Agreement individually accepts all restrictions, in this Agreement on the Franchisee as being binding upon himself or herself personally; unconditionally guarantees the Franchisee's full performance of this Agreement; and waives notice of acceptance of this guarantee, any right to require the Franchisor to proceed against the Franchisee, pursue any remedy, sue any party, give any notice of intent to accelerate, acceleration or otherwise and any requirement that the Franchisor not alter, extend, release, rearrange or substitute in whole or in part any debt, terms or security.

**Section 10.11** Notices.

Notices required or permitted under this Agreement will be in writing and either personally delivered, sent by registered mail, or any other means that provides reliable evidence of the date received by the respective party at its listed address unless and until the party designates a different address by written notice to the other party. The Franchisor's "Headquarters" and sole address for notice is President, Lady of America Franchise Corporation, 2400 E. Commercial Blvd., Suite 808, Fort Lauderdale, Florida 33308. The Franchisor may change the location of its headquarters to anywhere within the United States upon notice to the Franchisee, and this will be effective to change the same with respect to each reference to "Franchisor's Headquarters" contained in this Agreement. The Franchisee's address is designated hereinbelow. Written notices are deemed delivered at the time if delivered by hand, one business day after sending if by facsimile or comparable electronic system or, if sent by certified mail or other means which gives evidence of delivery, on the date of receipt or attempted delivery if delivery is refused or made impossible by the party being notified. If the Franchisor is reasonably unable to locate the Franchisee within 3 days, the Franchisee appoints each and every employee and agent of the Franchisee as Franchisee's agents to receive notices.

## ARTICLE 11

## INTERPRETATION

**Section 11.1** **Entire Agreement.**

The Franchise Agreement, its exhibits and the Manual, as the Manual may be revised as permitted in this Agreement, comprise the entire agreement of the parties and supersede all prior representations and agreements with respect to its subject matter. No representations have been made to induce execution of this Agreement that are not included. The Agreement may not be amended or waived and no representations may be made by the Franchisor, except as stated in this Agreement or in writing signed by the Franchisor's President. The rights and licenses granted by the Franchisor are limited, nonexclusive grants. No representations, grants, obligations, warranties, right to use, sell, copy or display any part of the System, its Marks, documents, know-how, patent rights, Proprietary Information or any other tangible or intangible thing or service, duties or limitations will be implied against the Franchisor unless expressly stated in this Agreement.

**Section 11.2** **Waivers.**

Whenever the Franchise Agreement requires the approval of the Franchisor, the Franchisee will make a timely written request to the Franchisor therefor. The Franchisor's approval must be in writing to be effective and relied on by the Franchisee. The Franchisor assumes no liability or obligation and makes no representation or warranty by denying, granting or providing any waiver, approval, advice, consent or suggestions to the Franchisee. Failure of the Franchisor to exercise any right, power or option or to insist on strict compliance with the terms of this Agreement or the Manual will not comprise a waiver with respect to any other or subsequent breach of the same or different nature nor a waiver of the Franchisor's right to, at any time, require exact and strict compliance with all terms of this Agreement and declare any breach or default. The Franchisor's rights and remedies in this Agreement are cumulative with any other rights or remedies that may be granted by law or equity. The description of any breach or default in any notice by the Franchisor will not preclude the later assertion of other additional defaults or breaches. Subsequent acceptance by the Franchisor of any payments or performance is not a waiver of any preceding breach by the Franchisee.

**Section 11.3** **Materiality.**

The Franchisee expressly agrees that each detail of the System is important and each term in this Agreement is reasonable and necessary for the protection of the Franchisor, other franchisees and consumers who rely on the uniformity, standards and enforcement of the System to maintain demand for the System's Products and services and protect its goodwill. The Franchisor's duties are expressly contingent on strict compliance by the Franchisee with all terms of the Franchise Agreement and the Manual and on Franchisee's full and honest completion of the franchisee application forms. Any breach of this Agreement or the Manual by the Franchisee is deemed a material and substantial breach. Time is of the essence. Calendar time periods in this

Agreement will be from the initial day to a like day in the named period (that is, one month and one year, respectively, from March 3, 1997, are April 3, 1997 and March 3, 1998).

**Section 11.4** **Governing Law.**

The Franchise Agreement is performable in the county of the Franchisor's Headquarters. The Franchisee is deliberately causing the Franchisor to undertake activities and incur expenses at the Franchisor's headquarters, is aware that substantial supervision and other activities will occur and continue to occur there due to this Agreement, will direct his or her payments and communications there and has and will develop a substantial and continuing relationship with the Franchisor there. TO OBTAIN THE CERTAINTY OF A SINGLE FORUM, ANY ACTION RELATING TO THIS AGREEMENT WILL ONLY BE INSTITUTED IN A STATE OR FEDERAL COURT SITTING IN THE JUDICIAL DISTRICT ENCOMPASSING THE FRANCHISOR'S HEADQUARTERS AND WILL NOT BE TRANSFERRED TO ANY COURT OUTSIDE OF THAT JUDICIAL DISTRICT. These courts have personal jurisdiction over all the signatories and guarantors of this Agreement, venue is proper there and only there and all parties waive all objections to venue and personal jurisdiction there. The Franchisee and those signing with and for him or her hereby appoint the Secretary of State of the State of Florida as one of their agents for service of process to receive any summons or service of process. The judgments and orders of these courts will be enforced by any court as if the same had originally issued there. THE FRANCHISE AGREEMENT AND THE RELATIONSHIP CREATED THEREBY WILL BE CONSTRUED AND GOVERNED SOLELY BY INTERNAL FLORIDA LAW, without regard to any conflict of law rules.

**Section 11.5** **Savings Clause.**

This Agreement will be construed and interpreted to avoid violating any applicable law. The unenforceability of any part, segment or clause of this Agreement will not affect the validity of the remaining portions of this Agreement as the parties would have signed the remaining portions of this Agreement without the portions as may be invalid except that if any portions relating to restrictions on the Franchisee or the Franchisee's payments to the Franchisor are finally determined to be unenforceable, the Franchisor may elect to terminate this Agreement. The Franchisee expressly agrees to be bound to the maximum extent permitted by law, as if separately stated in this Agreement, with respect to any part of this Agreement held to be unenforceable as written. The parties do not intend to charge usurious rates of interest. If applicable law determines any obligation in this Agreement, charge or payment to be an unlawful overcharge of interest, the obligation, charge or payment is automatically reduced to the maximum lawful rate, the excess to be refunded if already paid.

**Section 11.6** **Third Parties.**

The parties do not intend this Agreement to confer any benefit on any entity other than the Franchisee and the Franchisor except as is otherwise expressly stated in this Agreement. The Franchisee is not entitled to the benefit of any agreement between the Franchisor and any other entity unless that agreement specifically grants rights to the Franchisee by name. This Agreement

inures to the successors and assigns of the Franchisor. The Franchisor has the right to transfer or assign this Agreement. If the Franchisor's assignee assumes all obligations of the Franchisor under this Agreement, the assignment is without any Franchisee recourse to the Franchisor and the Franchisee will promptly sign a general release of the Franchisor and the Franchisor's affiliates, from all claims under this Agreement.

**Section 11.7 Construction.**

Capitalized terms are defined in this Agreement where they appear in quotation marks and have no other meaning. The recitals in this Agreement are contractual obligations of the parties. The language of this Agreement will other wise be construed according to its fair meaning and not for or against either party. All words refer to whatever number or gender the context requires. Headings are for reference purposes only and do not affect or control interpretation in any way. This Agreement and all transactions under this Agreement will be construed, interpreted and implemented in English.

**Section 11.8 WAIVER OF JURY TRIAL.**

THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY OF ALL CLAIMS MADE BETWEEN THEM WHETHER EXISTING NOW OR IN THE FUTURE, INCLUDING ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSS CLAIMS, THIRD PARTY CLAIMS AND INTERVENOR'S CLAIMS INVOLVING THE SALE, NEGOTIATION, SIGNING OR PERFORMANCE OF THE TRANSACTIONS INVOLVING THIS AGREEMENT.

## ARTICLE 12

## ACKNOWLEDGEMENT

**Section 12.1 Documents Received.**

The Franchisee agrees and represents that he or she received the Franchisor's 1999 Franchise Offering Circular and Franchise Agreement on 10-2, 1999. AVA (Franchisee's initials)

**Section 12.2 Representations.**

THE FRANCHISEE AND ALL PERSONS SIGNING WITH OR FOR HIM OR HER ACKNOWLEDGE THAT THEY HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE SYSTEM AND THIS BUSINESS VENTURE; THIS AGREEMENT INVOLVES A HIGH DEGREE OF BUSINESS AND FINANCIAL RISK; AND ITS SUCCESS WILL BE LARGELY DEPENDENT ON THEIR ABILITY AS INDEPENDENT BUSINESSPERSONS, THEIR FINANCIAL STRENGTH AND LOCAL MARKET CONDITIONS. THE FRANCHISEE HAS INVESTIGATED HIS OR HER TRADE AREA AND BELIEVES IT WILL SUPPORT THE BUSINESS VENTURE. THE FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND THE FRANCHISEE ACKNOWLEDGES

THAT HE OR SHE HAS NOT RECEIVED, ANY PROMISES OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORALLY, IN WRITING OR OTHERWISE OF ASSISTANCE, EXPENSES, BENEFITS, SALES VOLUMES, PROFITS, SUCCESS OR ANY OTHER MATTER EXCEPT AS EXPRESSLY MADE IN THIS AGREEMENT OR THE FRANCHISOR'S FRANCHISE OFFERING CIRCULAR. IF ANY PROMISES OR REPRESENTATIONS HAVE BEEN MADE, THE FRANCHISEE MUST LIST THEM BELOW. THE FRANCHISOR IS RELYING ON THE FRANCHISEE TO SEE THAT ALL MATTERS ARE INCLUDED IN WRITING IN THIS AGREEMENT, IF THEY ARE NOT, THE FRANCHISEE WILL NOT BE ABLE TO RELY IN ANY WAY ON ANY PROMISES OR REPRESENTATIONS AND THE FRANCHISOR WILL NOT BE BOUND BY THEM. THE FRANCHISEE ACKNOWLEDGES THAT THE FRANCHISEE HAS HAD AMPLE TIME TO CONSULT WITH ADVISORS OF HIS OR HER OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF THIS AGREEMENT AND THAT HE OR SHE HAS READ AND UNDERSTOOD IT.

George Murphy
Franchisee

2350 Pickwick Dr NV 89014
Address for Notices

702-286-1032
Home Phone

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
Social Security Number

**(FRANCHISEE)**

By: George Murphy
(Signature) Individually

George C Murphy
(Print Name)

Title: Franchisee

Date: 10-15-99

This Agreement is accepted by the Franchisor in Fort Lauderdale, Florida, effective on _______________ 1999.

**LADY OF AMERICA FRANCHISE CORPORATION**
**(FRANCHISOR)**

_______________________________________
By: Roger Wittenberns
Title: President

## EXHIBIT A TO LADY OF AMERICA FRANCHISE AGREEMENT

## SITE AGREEMENT

This supplements the Franchise Agreement between Lady of America Franchise Corporation (the "Franchisor") and ____________________ (the "Franchisee") which was accepted by the Franchisor on __________, 1999.

1. The Franchisee's Center is proposed to be located at the Site having the following street address:

Colonnade Square at Pebble

______________________________

______________________________

2. The Franchisee has carefully inspected the Site and its surrounding area, consulted with his or her own advisors and experts and believes the Center has a reasonable potential for success at this site.

3. The Franchisor accepts the Site as the premises for the Franchisee's Center under the terms of the Franchise Agreement.

______________________________

FRANCHISEE

By: [signature]
(Signature)

Date: 12-15, 1999

LADY OF AMERICA FRANCHISE CORPORATION
FRANCHISOR

By: ______________________________
(Signature)

Date: ____________________, 1999

H:\WP51\KJK\DOCS\4781-loa.wpd

LADY OF AMERICA

April 13, 2006

**VIA UPS OVERNIGHT MAIL**

George Murphy
2550 Pickwick Drive
Henderson, NV 89014

Re: Notice of Default and Automatic Termination

Dear Mr. Murphy:

Pursuant to the Franchise Agreement, by and between you and Lady of America Franchise Corporation (LOAFC), dated October 15, 1999 (Agreement), you are prohibited from voluntarily suspending normal business operations for the term of the Agreement, of the club located at 7220 W. Lake Meade Boulevard, Las Vegas, Nevada (the "Club"). Section 9.5 of the Agreement states:

> The Franchisee is in default and all rights granted in this Agreement to the Franchisee automatically terminate without notice to the Franchisee if the franchisee becomes "insolvent," defined as: voluntarily suspending business operations…

LOAFC has been advised that your club closed on or about April 10, 2006. Consequently you are hereby in default of the Agreement and LOAFC invokes its right to automatically terminate the Agreement effective immediately.

Please be advised that the Agreement contains certain post-term obligations and non-compete provisions that require you to undertake and perform certain duties in order to fully disengage from your relationship or appearance of a relationship with LOAFC. LOAFC demands that you comply and perform all necessary and required post-term obligations as set forth in Sections 8.3 8.4, 9.8 and Section 10.2 of the Agreement which shall remain in full force and effect.

LOAFC hereby reserves all rights under the Agreement and applicable law, including and without limitation, the right to monetary damages for unauthorized abandonment.

Please govern yourself accordingly.

Sincerely,

Jill Cook
General Counsel and Executive Vice President
jcook@ladyofamerica.com
Ext. 7880

EXHIBIT
B

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

MAGISTRATE JUDGE SNOW

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

LADY OF AMERICA FRANCHISE CORPORATION, a Florida corporation

**DEFENDANTS**

GEORGE MURPHY CIV-COHN

(b) County of Residence of First Listed Plaintiff: BROWARD COUNTY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: CLARK COUNTY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

HIMANSHU M. PATEL, ESQ.
ZARCO EINHORN SALKOWSKI & BRITO, P.A.
MIAMI, FLORIDA 33131 - TELEPHONE NO. (305) 374-5418

Attorneys (If Known)

**06-60567**

(d) Check County Where Action Arose: ☐ DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

0:06CV 60567-Cohn-LSS

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☒ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

28 USC § 1332; 28 USC § 1391 (a)(2)-Breach arising out of pre-mature termination of franchise agreement

LENGTH OF TRIAL via ____ days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ $75,000.00

CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ____ DOCKET NUMBER ____

DATE: 04/21/2006

SIGNATURE OF ATTORNEY OF RECORD: Himanshu M Patel

FOR OFFICE USE ONLY

RECEIPT # 536930 AMOUNT 350 ck APPLYING IFP ____